[No. G038984. Fourth Dist., Div. Three. Apr. 30, 2009.]

APPLERA CORPORATION, Plaintiff and Appellant, v.
MP BIOMEDICALS, LLC, Defendant and Appellant.

## Counsel

Whitehead & Porter, Stephen L. Porter and David B. Whitehead for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, David N. Makous, Eric J. Erickson and Allison Ann Arabian for Defendant and Appellant.

## Opinion

**IKOLA, J.**—Following a bench trial, the court below awarded plaintiff Applera Corporation $1,125,195 in contract damages based on defendant MP Biomedicals, LLC's failure to pay royalties on products sold under a patent licensing agreement. Defendant appeals the judgment, claiming the court erred in spectacular fashion by allowing the wrong plaintiff (standing is contested, as plaintiff is an assignee of the patent owner) to sue the wrong defendant (defendant is the ultimate parent corporation of a French entity that manufactured the licensed products at issue) in the wrong court (federal courts have exclusive jurisdiction over cases in which the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law). Not to be outdone, plaintiff cross-appeals, asserting the court awarded it too little in actual damages and improperly refused to tack on an award of attorney fees to the judgment. We affirm the judgment in its entirety, but reverse the postjudgment order denying plaintiff's request for an award of attorney fees.

## FACTS

As a matter of substantive contract law, this is an extraordinarily simple case. The parties acknowledge the existence and enforceability of a patent licensing agreement. Licensed products were sold by the agreement's licensee; indeed, the licensee prepared and provided to plaintiff certified royalty reports, which indicated the number of licensed products sold during the relevant time period. The licensee did not pay all royalties owed on the reported sales during the time period at issue. And finally, the licensing agreement prescribes a specific method for calculating royalties based on the number of units of licensed products sold under the agreement. In setting damages, the court accepted plaintiff's theory that some adjustments to the data and calculations in the certified royalty reports were necessary to arrive at the proper measure. Nevertheless, there is truth in the court's observation that "this [is] a straightforward breach of contract enforcement" and "under the facts of [the] case [plaintiff] may have been able to [plead the case as] an account stated."

Just beyond this apparent simplicity arises a tangle of unruly issues. Preeminent among the disputes is the propriety of the state court exercising subject matter jurisdiction over this case. In addition to this foundational inquiry, the parties also contest whether either is appropriately named in litigation over the contract at issue. Neither plaintiff nor defendant is named in the licensing agreement. The court awarded damages to plaintiff against defendant, but only for the time period following defendant's acquisition of the previous licensee corporation (and not for royalties owed for products sold prior to that acquisition). Some exposition of the terms of the licensing agreement, the history of the parties' involvement with the licensing agreement, the procedural history of the case, and the evidence actually presented at trial will be necessary to assess each of the issues raised by the parties.

### License Agreement

On July 1, 1997, Roche[1] and Appligene Oncor (a French corporation) entered into a contract entitled "Enzymes/PCR Patent License Agreement." The parties agree this is the relevant contract at issue. Under this contract, Roche granted to Appligene Oncor "a royalty bearing nonexclusive [worldwide] license" "to manufacture, . . . to use and to sell" a variety of products utilizing Roche's patent rights, as well as a license for performance of related scientific processes on which Roche owned the patents. The patents at issue describe and claim "nucleic acid amplification processes including, inter alia,

---

[1] "Roche" refers to both entities signing the agreement as licensor: F. Hoffmann-La Roche Ltd., a Swiss corporation, and Roche Molecular Systems, Inc., a Delaware corporation.

a process known as the polymerase chain reaction ('PCR') process." The PCR process reproduces large quantities of individual strands of DNA for use in research (e.g., the human genome project), medical care, and other fields (e.g., forensics). The importance of the processes claimed by the patents is illustrated by the inventor's (Kary Mullis) receipt of the Nobel Prize in chemistry for his efforts.

Appligene Oncor agreed to pay royalties for the license rights. Utilizing highly technical and complex defined terms (highlighted in boldface), the agreement sets forth a royalty schedule for several categories of products: "a) for a **Roche Patented Enzyme** or an **APPLIGENE Enzyme**, 15.5 [cents] per **Royalty Unit** for each such enzyme; [¶] b) for **Licensed Research Products** and **Licensed Application Products** that include **Roche Patented Enzymes** and/or **APPLIGENE Enzyme**, 15% of the **Net Sales** of each **Licensed Research Product** and **Licensed Application Product** or 15.5 [cents] per **Royalty Unit** for each such enzyme included in such Product, whichever is larger; [¶] c) for **Licensed Application Products** which contain neither **Roche Patented Enzymes** nor **APPLIGENE Enzymes**, 15% of the **Net Sales** of each Product."

It is unnecessary for our purposes to set forth the contractual definition of each term. It suffices to say that the definitions for these terms incorporate the claims of various United States patents as well as foreign patents which correspond to and claim priority from the United States patents. For instance, the definition of "**Licensed Research Product**" indicates such products "consist of or contain a **Licensed Product** . . . ." " '**Licensed Product**' shall mean: [¶] a) a **Roche Patented Enzyme** or [an] **APPLIGENE Enzyme** used or sold in a country where the use or sale of such **Roche Patented Enzyme** or **APPLIGENE Enzyme** would infringe at least one **Valid Claim** of a patent or patent application within [variously contractually defined categories of patent rights]." " '**Valid Claim**,' " in turn, "shall mean the claim of a patent or pending patent application which has not been held invalid or otherwise unenforceable by a court from which no appeal has or can be taken, or has not otherwise finally been held unpatentable by the appropriate administrative agency." In short, the license agreement links its definitions of various licensed products to patent claims, and does not purport to require continued royalty payments on products or processes in the absence of a valid patent claim on such products or processes.

The license agreement is "self-reporting," in that the licensee is required to prepare and submit to the licensor quarterly reports identifying royalty-bearing sales of licensed products and calculating the amount due based on the royalty rates identified above. "The correctness and completeness of each such report shall be attested to in writing by the responsible financial

officer . . . or by [licensee's] external auditor or by the chairman or other head of [licensee's] internal audit committee." "Simultaneously with the delivery of each such royalty report, [licensee] shall pay . . . the royalty and any other payments due under this Agreement for the period covered by such report."

The license agreement indicates it is "subject to and shall be construed and enforced in accordance with the laws of Switzerland." Further, the license agreement provides that "all disputes arising from or in connection with" the agreement shall be resolved "by an Arbitral Tribunal in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce."

*Parties' Involvement with License Agreement*

Following execution of the license agreement, licensee Appligene Oncor was acquired by a Canadian corporation, Qbiogene, Inc., which also had a licensing agreement with Roche. Following this consolidation of the two Roche licensees, Qbiogene, Inc.'s wholly owned subsidiary, Qbiogene S.A., manufactured licensed products in France and sold the products in worldwide markets.[2] Qbiogene S.A. prepared royalty reports and forwarded such reports to Qbiogene, Inc.'s headquarters in Canada, and the reports were then forwarded to Roche. In 2002, Roche and Qbiogene, Inc., resolved a dispute concerning past royalties and confirmed the agreement described herein would govern the parties' relationship in the future.

On March 10, 2004, Qbiogene, Inc., filed a debtor protection petition for reorganization in Canada. Royalties due prior to March 10, 2004, were paid to Roche (presumably at a discount) through the Canadian bankruptcy proceeding. Thereafter, Qbiogene, Inc., submitted reports and paid some royalties to Roche during its bankruptcy, although it failed to pay all of the royalties it reported.

On September 23, 2004, defendant MP Biomedicals, LLC, a Delaware limited liability company with its principal place of business in Irvine, California, acquired the stock of Qbiogene, Inc., through the Canadian bankruptcy process. Qbiogene, Inc., thereby became a wholly owned subsidiary of defendant, while Qbiogene, S.A., remained a wholly owned subsidiary of Qbiogene, Inc. Qbiogene, S.A., however, changed its name to MP Biomedicals, S.A. MP Biomedicals, S.A., continued to manufacture (in France) and sell licensed products under the agreement with Roche, and to

---

[2] The record is unclear as to precisely how the Qbiogene entities acquired and succeeded to Appligene Oncor's interests. Testimony indicates that "Qbiogene SA was the old Appligene Oncor piece of business," but whether this was a renaming of Appligene Oncor or a new entity formed to take on the assets of Appligene Oncor is not apparent.

prepare royalty reports for such sales of licensed products. There was no product catalogue for "Qbiogene" after 2005; all licensed products were advertised and sold under the name "MP Biomedicals." The parties contest both whether defendant MP Biomedicals, LLC, can be held responsible for any of the royalties and, if so, whether defendant can be held liable for royalties that arose prior to September 23, 2004.

On May 6, 2005, Roche assigned plaintiff Applera Corporation (a Delaware corporation with its principal place of business in California) "as of the Effective Date all of [Roche's] rights under [the licensing agreement at issue here and other licensing agreements]. [A]ll collection efforts and enforcement actions in regard to the Existing License Agreements shall be conducted solely by Licensee and Licensee shall be entitled, subject to the terms and conditions of this Agreement, to collect all royalties and other consideration accruing or arising in respect of the Existing Licensee Agreements on and after the Effective Date." On May 11, 2005, Roche sent notification of this assignment to "Qbiogene S.A." at Qbiogene, Inc.'s Montreal address. The parties contest both whether plaintiff is entitled to sue to collect any royalties and, if so, whether plaintiff can sue for royalties that arose prior to May 2005.

*Procedural History*

On August 15, 2005, plaintiff filed a complaint for breach of contract and breach of the covenant of good faith and fair dealing against "MP Biomedicals, a Delaware corporation," in Orange County Superior Court; plaintiff attached a license agreement and incorporated such agreement into the pleading.[3] After describing the parties' relationship to the license agreement, the complaint alleges the license required royalty payments and the provision of royalty reports as described above. The complaint then alleges: "MP Biomedicals has materially breached the License by continuing to sell, distribute and/or transfer the [products[4]] covered by the License without providing any royalties or royalty reports to Applera for the sales, distribution or transfers of said patented technologies."

Defendant answered the complaint with a general denial of the allegations, and indicated that it appeared notwithstanding plaintiff's erroneous naming of

---

[3] Plaintiff mistakenly attached a January 1998 licensing contract between Roche and Quantum Biotechnologies Inc. (the name of Qbiogene, Inc., before its acquisition of Appligene Oncor). As already noted, Roche and Qbiogene, Inc., clarified in 2002 that the Appligene Oncor license agreement discussed above would be the operative agreement between them in the future. Furthermore, the parties conceded at trial and here that the Appligene Oncor license agreement was applicable to this dispute. For purposes of our review, we will assess the complaint as if the proper contract had been attached.

[4] The complaint mistakenly referenced the sale, distribution, and transfer of "patents" rather than "products." The court permitted plaintiff to amend the complaint during trial to replace the word "patents" with the word "products."

"MP Biomedicals, a Delaware corporation" as defendant. Defendant also pleaded a number of affirmative defenses, including a defense alleging the expiration of the patents underlying the license agreement: "The United States patents governing the technology that forms the basis for Plaintiff's complaint expired on March 28, 2005 and therefore Plaintiff can claim no royalties on the obligations of products sold in the United States. Plaintiff's patent on said technology as used in Europe will expire on March 28, 2006 and thereafter no damages can be claimed by Plaintiff."

Plaintiff propounded written discovery requests to which defendant responded in March 2006. Included was a set of requests for admission. Remarkably, given its positions at trial and on appeal, defendant admitted, without qualification or explanation, the following statements: "1. Admit that YOU assumed or otherwise acquired the rights which arise out of the LICENSE. [¶] [2–7]. Admit that YOU have not paid APPLERA any royalties for the sales, distribution or transfer of [Roche Patented Enzymes, APPLI-GENE Enzymes, Licensed Research Products, and Licensed Application Products], as defined in the LICENSE, since the date YOU assumed or otherwise acquired the rights which arise out of the LICENSE. [¶] . . . [¶] 9. Admit that YOU are required to pay APPLERA royalties for the sales of certain technologies under the LICENSE. [¶] . . . [¶] 13. Admit that since the date YOU assumed or otherwise acquired the rights which arise out of the LICENSE, YOU purposefully withheld royalty payments from APPLERA." Defendant explained its purposeful withholding of payments with the following coda to its response: "Defendant withheld payment from Applera where necessary to compete with market conditions. To the extent that Defendant's predecessor-in-interest, Qbiogene, withheld payments while Qbiogene was in bankruptcy court in Montreal, Canada, Defendant is unaware as to whether Qbiogene made or did not make payments."

Just as curious (again, given defendant's position at trial and on appeal) is defendant's failure to object to the definition of "YOU" provided in plaintiff's requests: "The terms 'YOU' and 'YOUR' shall mean and refer to the defendant, MP Biomedicals, Inc., all divisions of MP Biomedicals, including but not limited to MP Biomedicals' officers, directors, agents, employees, and attorneys, and any affiliates of MP Biomedicals, Inc. owned by or owning MP Biomedicals, Inc., to the extent of 50% or greater of the relevant controlling interest." Defendant simply admitted each of the referenced statements without any objection to the defined term or explanation as to whether the admissions applied to defendant or one of its "affiliates." (See Code Civ. Proc., § 2033.220, subd. (b) [party must admit the part of the request that is true and deny

the part of the request that is untrue].)[5] Thus, the unqualified responses to the requests for admissions established that "MP Biomedicals, Inc.," *and* each of its divisions *and* affiliates owned "to the extent of 50% or greater" owed royalties to Applera which they had "purposefully withheld." (Code Civ. Proc., § 2033.410, subd. (a) ["Any matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action . . . ."].)

Beginning in January 2006, "MP Biomedicals," identifying itself as licensee as of January 2005, began transmitting royalty reports to plaintiff for the period of October 2004 through March 2006. Defendant claims these documents were produced through MP Biomedicals, LLC, due to its discovery obligations; plaintiff disagrees and claims the reports were produced as a result of ongoing discussions between business people working for plaintiff and defendant. Either way, the royalty reports identified sales of licensed products and set forth the licensee's position on the amount of royalties owed under the license agreement.

In July 2006, current counsel for defendant substituted in as counsel of record. Following this substitution, and with trial approaching, the parties swamped the court with a succession of motions. Plaintiff unsuccessfully moved for summary judgment. Defendant unsuccessfully moved to amend its discovery responses. Defendant also unsuccessfully moved for judgment on the pleadings, claiming the court lacked subject matter jurisdiction and also asserting it was not a proper party to the action. The parties also filed extensive motions in limine. Despite the plethora of motions, neither of the parties ever petitioned to compel arbitration as contemplated by the contract, and, during the trial and in pretrial motions, neither party invoked the law chosen in the license agreement (Switzerland).

*Evidence Presented at Trial*

The parties mutually agreed before trial that the royalties in dispute in this action cover product sales from and after March 10, 2004 (the date Qbiogene, Inc., filed for bankruptcy), through March 31, 2006 (the approximate date of expiration for Roche's international patent rights as alleged in defendant's answer). It is also undisputed that all product sales at issue were made outside the United States, thus eliminating the relevance of any argument concerning the expiration of patent rights in the United States in 2005 as alleged in defendant's answer.

---

[5] The complete text of Code of Civil Procedure section 2033.220, subdivision (b), provides that "[e]ach answer shall: [¶] (1) Admit so much of the matter involved in the request as is true, either as expressed in the request itself or as reasonably and clearly qualified by the responding party. [¶] (2) Deny so much of the matter involved in the request as is untrue. [¶] (3) Specify so much of the matter involved in the request as to the truth of which the responding party lacks sufficient information or knowledge."

Plaintiff's case relied on the license agreement, the admissions made by defendant in discovery, the royalty reports and other documents produced by defendant, and the testimony of plaintiff's licensing director, Susan Cole. Cole prepared a spreadsheet, which was admitted into evidence, recalculating royalties based on certain changes to the royalty reports provided by defendant. She opined that, for some 2005 and 2006 sales, the royalty calculation for "licensed research products" had been incorrectly calculated (by not applying the greater of the 15.5 cents per royalty unit or the 15 percent of the "Net Sales" calculation), resulting in an underdesignation of royalties on the reports. Cole also opined that the royalty reports underreported sales of licensed products in 2004 based on her review of sales reports produced by defendant and product literature from defendant's Web site. Cole recalculated royalties owed based on her adjustment of the licensed product sales figures; she simply applied the royalty schedule from the license agreement. Cole's calculation of total damages came to approximately $1.6 million.

Defendant called only one witness, Thomas McLean. McLean is the former president of Qbiogene, Inc., and became an officer of defendant following its acquisition of Qbiogene, Inc. McLean testified to the following: MP Biomedicals, S.A. (MPSA), is the only entity that ever sold licensed products (not defendant); MPSA prepared all royalty reports and sales reports, and forwarded such reports to Qbiogene, Inc., in Montreal; the royalty reports were never sent to defendant in Irvine; proceeds from sales of licensed products were always received by MPSA, and were never accessible to defendant; and the notation "MP Biomedicals" as licensee on the royalty reports refers to MPSA, not defendant. Plaintiff attempted to impeach McLean by pointing to what it deemed inconsistent testimony at his deposition and in defendant's verified written discovery responses. McLean made no attempt to undermine the accuracy of Cole's royalty calculations. Nor did defendant attempt to establish that any of the sales included in the royalty reports were noninfringing products not covered by the license agreement.

The court found in favor of plaintiff on its breach of contract cause of action, awarding plaintiff $1,125,195 in damages. "In reaching its decision, the Court finds that Plaintiff and Defendant were parties to a Licensing Agreement (Exhibit 1). The evidence established (by a preponderance) that Defendant . . . had acquired and claimed its rights under Exhibit 1 in September 2004 as a result of its . . . purchase of Qbiogene, Inc. (aka Qbiogene Montreal), from the bankruptcy Court in Canada. At the time of that acquisition Qbiogene, Inc. was the licensee under Exhibit 1." The court largely accepted Cole's analysis of royalties owed, but declined to hold defendant liable for royalties incurred prior to defendant's September 2004 acquisition of Qbiogene, Inc., and disagreed with the notion that defendant was not entitled to an offsetting credit provided for by the contract simply because defendant had not timely paid the royalties.

At a posttrial hearing, the court declined to award attorney fees to plaintiff under Swiss law. There is not a contractual attorney fees provision, but plaintiff argued Swiss law was selected in the license agreement, and that it provides for attorney fees for the prevailing party as a matter of course.

## DISCUSSION

*Subject Matter Jurisdiction*

■ Subject matter jurisdiction cannot be waived by the parties; California courts must satisfy themselves as to their power to decide a case, regardless of the stage of the proceedings. (Code Civ. Proc., § 430.80, subd. (a).) Here, the parties opted not to arbitrate the dispute in a Swiss arbitral tribunal as contemplated by the license agreement, apparently preferring to litigate the matter in California. Plaintiff claims the trial court and this court may properly exercise jurisdiction over the breach of contract claim at issue; defendant asserts the federal courts have exclusive jurisdiction over the case because the complaint as pleaded requires resolution of a substantial issue of patent law.

■ "The district courts [of the United States] shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . . Such jurisdiction shall be exclusive of the courts of the states in patent . . . cases." (28 U.S.C. § 1338(a) (section 1338(a)).) "[Section] 1338(a) jurisdiction . . . extend[s] only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." (*Christianson v. Colt Industries Operating Corp.* (1988) 486 U.S. 800, 808–809 [100 L.Ed.2d 811, 108 S.Ct. 2166] (*Christianson*).)

"[T]he district court's [patent] jurisdiction is determined by reference to the well-pleaded complaint, not the well-tried case . . . ." (*Christianson, supra,* 486 U.S. at p. 814.) And as plaintiff is "the master of the complaint," neither "federal defense[s]" raised in the answer nor "federal counterclaim[s]" can be considered in determining jurisdiction under section 1338(a). (*Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.* (2002) 535 U.S. 826, 829–834 [153 L.Ed.2d 13, 122 S.Ct. 1889] ["Not all cases involving a patent-law claim fall within [§ 1338(a)] jurisdiction."].)

This case does not fall under the first prong of *Christianson, supra,* 486 U.S. at pages 808–809, i.e., a case with a cause of action created by federal patent law. Plaintiff did not sue defendant for patent infringement (e.g., *Quanta Computer, Inc. v. LG Electronics, Inc.* (2008) 553 U.S. ___ [170 L.Ed.2d 996, 128 S.Ct. 2109]), nor did defendant file a declaratory relief action to

determine the validity of the patents at issue (e.g., *Medimmune, Inc. v. Genentech, Inc.* (2007) 549 U.S. 118 [166 L.Ed.2d 604, 127 S.Ct. 764]).

Defendant contends this case falls under *Christianson's* second prong, i.e., patent law is a necessary element of plaintiff's claim. Plaintiff claims breach of contract, a quintessential state law cause of action. Plaintiff's complaint seeks damages based on the royalty schedule in the agreement at issue and does not pursue remedies provided by federal patent law. On the other hand, the agreement obligates the licensee to pay royalties when it sells products defined and identified by their utilization of patented processes and features. Defendant claims part of plaintiff's case-in-chief—at least as pleaded in the complaint—would be to show defendant breached by selling licensed products under a valid patent, without paying royalties. Defendant concludes that the need to prove the element of breach necessarily entails the resolution of substantial questions of patent law by the court (i.e., the question of whether the products sold were licensed products and the question of whether the underlying patents were valid), a task not within the power of state courts as explained by *Christianson, supra,* 486 U.S. at pages 808–809.

■ It has traditionally been understood that actions for breach of a patent licensing agreement arise under state law, notwithstanding the potential for state law adjudication of patent issues. (See, e.g., *H. J. Heinz Co. v. Superior Court* (1954) 42 Cal.2d 164, 173 [266 P.2d 5]; *Rogers v. Hensley* (1961) 194 Cal.App.2d 486, 490–491 [14 Cal.Rptr. 870]; *Schwarzkopf Development v. Ti-Coating, Inc.* (Fed.Cir. 1986) 800 F.2d 240, 244.) The question presented, however, is whether *Christianson, supra,* 486 U.S. at pages 808–809, shifted the historic dividing line between state and federal jurisdiction in breach of patent licensing agreement cases. Several post-*Christianson* cases suggest a breach of licensing agreement case *can* merit exclusive federal jurisdiction. (*U.S. Valves, Inc. v. Dray* (7th Cir. 1999) 190 F.3d 811, 813–814, affd. (Fed.Cir. 2000) 212 F.3d 1368, 1372 (*Dray*); *Scherbatskoy v. Halliburton Co.* (5th Cir. 1997) 125 F.3d 288, 291 (*Scherbatskoy*); *Kleinerman v. Luxtron Corp.* (D.Mass. 2000) 107 F.Supp.2d 122, 124 (*Kleinerman*).)

It has been observed "that '[t]he line between cases that "arise under" patent . . . laws, as contemplated by . . . § 1338(a), and those that present only state law contract issues, is "a very subtle one," [citation] and the question leads down "one of the darkest corridors of the law of federal courts and federal jurisdiction." ' " (*Holiday Matinee, Inc. v. Rambus, Inc.* (2004) 118 Cal.App.4th 1413, 1425 [13 Cal.Rptr.3d 766].) Federal patent jurisdiction as interpreted by *Christianson, supra,* 486 U.S. at page 809, *potentially* encroaches on any state law cause of action involving patent issues, including a contract claim to enforce a royalties provision in a patent licensing agreement. Nevertheless, it remains true that " ' "[a] case does not arise under the patent laws merely because questions of patent law may arise in the course of

interpreting a contract . . . ." The fact that an issue of patent law may be relevant in the interpretation of a contractual dispute "cannot possibly convert a suit for breach of contract into one 'arising under' the patent laws as required to render the jurisdiction of the district court based on section 1338." ' " (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 125 [61 Cal.Rptr.3d 221] (*Linear*).)[6] To address the jurisdictional "subtleties" of this case, we consider the *Christianson* opinion in greater detail.

█ First, in construing the reach of federal jurisdiction under section 1338(a), the *Christianson* court relied upon long-established precedent construing "identical language in other jurisdictional provisions, particularly the general federal-question provision, 28 U. S. C. § 1331." (*Christianson, supra,* 486 U.S. at p. 808.) The Court explained that general federal question jurisdiction "extends over 'only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law,' [citation], in that 'federal law is a necessary element of one of the well-pleaded . . . claims.' " (*Ibid.*) Thus, the jurisdictional test under section 1338(a) is identical to the test under the general federal question jurisdiction statute. The word "patent" merely modifies the word "law" in the statement of the test. Accordingly, in examining the jurisdictional issue in this case, it is appropriate to rely upon cases involving jurisdictional disputes under both section 1338(a) and section 1331 of title 28 of the United States Code.

█ Second, the *Christianson* court explained that "whether a claim 'arises under' patent law ' "must be determined from what *necessarily* appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." ' " (*Christianson, supra,* 486 U.S. at p. 809, italics added.) Further, "If 'on the face of a well-pleaded complaint

---

[6] *Linear, supra,* 152 Cal.App.4th at pages 125–127, did not involve a royalty dispute, but did address the question of state law jurisdiction in a breach of contract dispute involving patent issues. There, plaintiff alleged defendants breached noninfringement warranties in sales of goods contracts by failing to defend and indemnify plaintiffs against a patent infringement suit in federal court. (*Id.* at pp. 120–122, 125–126.) The federal action involved claims that plaintiff's semiconductor manufacturing process, which involved the use of various pieces of equipment purchased from defendants, violated process patents held by a nonparty to the *Linear* action. (*Id.* at pp. 121–122.) The court concluded the *Linear* case was properly filed in state court: "The first cause of action in the [complaint] sounds in contract. The only issue bearing upon the nature of [the] process patents is whether the infringement of those patents arose from Linear's *use* of the equipment it purchased from respondents. The determination of that question does not necessitate resolution of a substantial question of federal law, but entails only factual questions—in particular, what was the nature of each patent and was there a causal connection between Linear's use of the processing equipment and its infringement of [the process] patents." (*Id.* at pp. 126–127.)

there are . . . reasons completely unrelated to the provisions and purposes of [the patent laws] why the [plaintiff] may or may not be entitled to the relief it seeks,' [citation], then the claim does not 'arise under' those laws. [Citation.] Thus, a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction *unless patent law is essential to each of those theories.*" (*Id.* at p. 810, italics added.) "The well-pleaded complaint rule . . . focuses on claims, not theories, [citations], and just because an element that is essential to a particular theory might be governed by federal patent law does not mean that the entire . . . claim 'arises under' patent law." (*Id.* at p. 811.)

■ Here, the court properly accepted jurisdiction over the claims made by plaintiff. There are two *potential* patent law questions raised by the August 2005 complaint: (1) whether products sold by the licensee[7] were licensed products as defined in the agreement (which requires the determination of whether the products utilized the patented claims and processes referenced in the agreement); and (2) whether the patents underlying the licensed products are valid. But neither of the *potential* issues compels federal jurisdiction in this case because neither is *necessarily* an element of a well-pleaded cause of action for breach of the license agreement.

On the face of this complaint, there are " 'reasons completely unrelated to the provisions and purposes of [the patent laws] why the [plaintiff] may or may not be entitled to the relief it seeks.' " (*Christianson, supra,* 486 U.S. at p. 810.) The alleged breach consisted of the sale, distribution, and transfer of products "covered by the License without providing any royalties or royalty reports to Applera for the sales, distribution or transfers of said patented technologies." Thus, under the complaint, the breach could consist merely of the failure to pay royalties concurrently with the submission of a royalty report in which defendant acknowledges the sale of products covered by the license. Plaintiff can proceed to its proof of breach without any need whatsoever to invoke federal patent law. Indeed, that is precisely how plaintiff did proceed to make its proof; the court was not required to address any patent law issues. As made clear in *Christianson,* "[t]he well-pleaded complaint rule . . . focuses on claims, not theories, [citations], and just because an element that is essential to a particular theory might be governed by federal patent law does not mean that the entire . . . claim 'arises under' patent law." (*Id.* at p. 811.) Although it is true patent law issues conceivably could still arise in such an action—the parties might disagree as to the categorization of certain products—relief would not *necessarily depend* on the resolution of such issues.[8]

---

[7] We ignore for now the issue of whether defendant was the licensee.

[8] Had plaintiff alleged solely that defendant refused to provide *any* royalty reports at *any* time, the outcome of the jurisdictional question may have been different, as the court

■ Moreover, the issue of patent *validity* could be litigated in this case only as an affirmative defense to payment of royalties, which cannot create federal jurisdiction. (See *Lear, Inc. v. Adkins* (1969) 395 U.S. 653, 675–676 [23 L.Ed.2d 610, 89 S.Ct. 1902] [in case holding licensees may utilize a patent invalidity clause as an affirmative defense to licensor's action for royalties, Supreme Court remands case to California state courts for adjudication of merits].) Under the agreement, a " 'Valid Claim' shall mean the claim of a patent or pending patent application which has not been held invalid or otherwise unenforceable by a court from which no appeal has or can be taken, or has not otherwise finally been held unpatentable by the appropriate administrative agency." This contractual language provides the licensee with the opportunity to plead and prove patent invalidity as a defense. (Cf. *Durgom v. Janowiak* (1999) 74 Cal.App.4th 178, 182–187 [87 Cal.Rptr.2d 619] [applying § 1338(a), court satisfied itself of its jurisdiction by categorizing as defenses arguments for the invalidity of the licensor's copyright under federal law].) Part of the benefit of the licensing agreement bargain to a patent licensor is that the patents underlying the licensed products and processes identified in the agreement are presumed to be valid absent a prior court or administrative agency finding to the contrary.[9] The United States Supreme Court has endorsed challenges to patent validity by licensees (*Lear, Inc.*, at pp. 675–676), but the law does not require a licensor to prove patent validity as an element of a claim for licensing royalties in the first instance.

## Plaintiff's Standing

■ Defendant next argues plaintiff lacks standing to pursue this case. A party's standing can be raised at any time in the litigation, even for the first time on appeal. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361 [87 Cal.Rptr.2d 654, 981 P.2d 499].) Here, the issue is whether plaintiff had the right to sue for damages arising out of the license agreement. The trial court rejected defendant's entreaties related to plaintiff's standing on several occasions, finding Roche had assigned to plaintiff the right to collect royalties from its licensees. We

necessarily would have been required to review the patent claims underlying the definitions of the various licensed products in the agreement to determine whether the licensee sold licensed products and was therefore required to provide royalty reports. This counterfactual scenario is more akin to the authorities discussed above in which *Christianson* was held to apply to licensing agreement disputes. (See *Dray, supra,* 190 F.3d at pp. 813–814; *Scherbatskoy, supra,* 125 F.3d at p. 291; *Kleinerman, supra,* 107 F.Supp.2d at p. 124.)

[9] Rather than asserting patent invalidity as an affirmative defense, a licensee could also pay royalties under protest, then file an action for declaratory relief in federal court to prove the invalidity of the patents. (See *Medimmune, Inc. v. Genentech, Inc., supra,* 549 U.S. at pp. 135–137.) *Medimmune* did not explicitly discuss whether such a claim arises under the patent laws, but it appears that following this course is a way for a licensee to ensure that the issue of patent validity is litigated in federal court rather than as a defense to a state court action.

will review de novo the court's interpretation of the agreement between Roche and plaintiff. (*Postal Instant Press, Inc. v. Sealy* (1996) 43 Cal.App.4th 1704, 1708 [51 Cal.Rptr.2d 365] ["An appellate court appropriately conducts a de novo review of a trial court's interpretation of the language of a contract . . . ."].)

The parties are in agreement that on May 6, 2005, Roche assigned its rights as licensor under the license agreement to plaintiff, but did not assign any of the underlying patent rights to plaintiff. Defendant argues plaintiff lacks standing to pursue this action in its entirety because plaintiff does not own any of the patent rights underlying the license agreement. In support of this argument, defendant cites a series of cases from the Federal Circuit Court of Appeals indicating that "[s]tanding to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue . . . ." (*Prima Tek II, L.L.C. v. A-Roo Co.* (Fed.Cir. 2000) 222 F.3d 1372, 1381; see also *Morrow v. Microsoft Corp.* (Fed.Cir. 2007) 499 F.3d 1332, 1337; *Sicom Systems, Ltd. v. Agilent Technologies, Inc.* (Fed.Cir. 2005) 427 F.3d 971, 976; *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.* (Fed.Cir. 1995) 52 F.3d 1026, 1034.)

■ But the case before us is a breach of contract action for royalties against a licensee, and not a patent infringement action against a nonlicensed party. We reject defendant's novel argument that the right to collect royalties owed on a patent licensing agreement cannot be assigned without also assigning the underlying patent rights. Rights to payment and choses in action may be assigned under California law. (Civ. Code, §§ 954 ["A thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner."], 1044 ["Property of any kind may be transferred, except as otherwise provided by this Article."].)

Defendant also contends plaintiff lacked standing to sue for any royalties on sales occurring prior to the effective date of the assignment, May 6, 2005. We disagree with this interpretation of the assignment by Roche to plaintiff. The assignment makes clear that plaintiff received all enforcement rights on specified licensing agreements (including the agreement at issue here), the right to all royalties accrued after the effective date, and the right to an equal share (50 percent) of pre-May 6, 2005 royalties that had not yet been collected.[10] Plaintiff was entitled to sue for unpaid royalties from May 2004

---

[10] Section 2.5 of the assignment agreement provides in relevant part: "Licensor hereby transfers and assigns to Licensee effective as of the Effective Date all of Licensor's rights . . . . Licensor and Licensee shall each account to the other Party and turn over . . . sufficient funds or other consideration received by them from the third party licensees in respect of all royalty or other payment obligations accrued by the said third party licensees before the Effective Date . . . such that both Licensor and Licensee shall share equally in such

to May 2005. It appears plaintiff has a contractual obligation to remit half of the pre-May 2005 royalties recovered to Roche, but that issue does not affect plaintiff's standing to sue defendant for such royalties.

Defendant also claims the court precluded it from advancing its standing argument by conducting an ex parte examination of plaintiff's representatives and the assignment agreement for the purposes of determining that the agreement contained trade secrets.[11] Before trial, plaintiff refused to produce an unredacted copy of the assignment agreement on the grounds that the agreement contained trade secrets. Instead, plaintiff produced a heavily redacted version of the agreement (§ 2.5, the assignment provision, was largely unredacted) and produced a minimally redacted version for defendant's counsel's review under an "attorneys' eyes only" confidentiality agreement. Defendant never moved to compel production of the entire agreement at any time, but instead refused to stipulate to admission of the redacted version at trial (plaintiff needed to introduce § 2.5 of the agreement to establish its standing).

The court, after an initial review of the assignment agreement, found it did not contain trade secrets. Plaintiff protested that it could not submit evidence explaining the nature of the trade secrets contained in the document without disclosing those same trade secrets. Plaintiff requested the court to receive in camera testimony pertaining to the assignment agreement under Evidence Code section 915, subdivision (b).[12] The court granted this motion, inviting counsel for plaintiff and plaintiff's corporate representatives into chambers, but excluding counsel for defendant at the request of plaintiff's representatives. After hearing plaintiff's in camera explanation, the court agreed the assignment agreement contained trade secrets irrelevant to the case.

---

pre-Effective Date royalties or other consideration. . . . On and after the Effective Date, all collection efforts and enforcement actions in regard to the Existing License Agreements shall be conducted solely by Licensee and Licensee shall be entitled, subject to the terms and conditions of this Agreement, to collect all royalties and other consideration accruing or arising in respect of the Existing License Agreements on and after the Effective Date."

[11] To be clear, defendant does not argue on appeal that the assignment agreement does not contain trade secrets or should not have been sealed.

[12] Evidence Code section 915, subdivision (b), provides in relevant part: "When a court is ruling on a claim of privilege . . . under Section 1060 (trade secret) . . . and is unable to do so without requiring disclosure of the information claimed to be privileged, the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and any other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged, neither the judge nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers."

Plaintiff claims the court's ex parte examination of the agreement and its corporate representatives was proper under Evidence Code section 915, subdivision (b). We agree that the redacted portions of the assignment agreement are completely irrelevant to the issues in this action. We also agree the court has discretion to receive testimony in camera to assist it in deciding whether documents contain trade secrets. Even assuming the court's review of the document was procedurally improper in this case (which it was not), we see no harm to defendant on the merits of the issue of standing or any other issue before us on appeal.

*Substantial Evidence Supports the Judgment Against Defendant*

Both parties challenge the sufficiency of the evidence presented at trial in support of the judgment. Defendant appeals on the ground that plaintiff sued the wrong party. According to defendant, its subsidiaries, MP Biomedicals S.A. and/or Qbiogene, Inc., are the only parties that may be held liable for any damages awarded. Plaintiff cross-appeals, claiming the court erred in finding defendant responsible only for royalties owed following its acquisition of Qbiogene, Inc.

With regard to both questions, we review the judgment for substantial evidence. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925].)

Substantial evidence supports the court's decision to hold defendant liable for royalties. Defendant admitted in its responses to requests for admission that it acquired the licensing rights at issue, that it had the obligation to pay plaintiff royalties on sales of licensed products, and that it had failed to do so since its acquisition of the licensing rights. Those admissions are binding. (Code Civ. Proc., § 2033.410, subd. (a).) Furthermore, the royalty reports submitted to plaintiff identified "MP Biomedicals" as the licensee, not differentiating between defendant MP Biomedicals, LLC, and nonparty MP Biomedicals, S.A. The court chose to disbelieve or discount defendant's explanation at trial that the real licensee was its subsidiary. We will not reweigh the evidence.

Substantial evidence also supports the court's decision to award damages only for royalties incurred by defendant since its acquisition of Qbiogene, Inc. The court found the evidence supported a finding that defendant was a

licensee after the September 23, 2004 acquisition of Qbiogene, Inc., but not before that time. The evidence suggests defendant acquired Qbiogene, Inc.'s stock in September 2004. Shortly thereafter, licensed products were sold under the "MP Biomedicals" name. It may be that plaintiff could have collected damages for pre-September 2004 royalties from MP Biomedicals, S.A. (formerly Qbiogene, S.A.), or Qbiogene, Inc.; the change in ownership of these entities' stock by a new parent corporation (defendant) did not extinguish their preexisting liabilities. But defendant's responses to the requests for admissions only admitted its responsibility for royalty obligations from the date it acquired its rights under the license agreement. This was substantial evidence supporting the court's finding that defendant (rather than its subsidiaries) was only responsible for royalties incurred after the acquisition.

*Attorney Fees and the Applicability of Swiss Law*

Finally, plaintiff appeals the court's refusal to award it attorney fees as the prevailing party. The licensing agreement does not contain an attorney fees provision, but it does state: "This Agreement and its effect are subject to and shall be construed and enforced in accordance with the laws of Switzerland." According to plaintiff (and defendant does not dispute this point), Swiss law provides for the award of attorney fees to the prevailing party as a matter of course (the "English Rule"). This differs from California law, which requires explicit statutory authorization of, or an "express or implied" contract providing for, an attorney fees award to the prevailing party (the "American Rule"). (Code Civ. Proc., § 1021.) Because the licensing agreement selects Swiss law, plaintiff reasons, the court was required to honor such selection by awarding it attorney fees.

Defendant argues that (1) plaintiff "waived or forfeited the right to invoke Swiss law," (2) reliance on Swiss law "is barred by the doctrine of judicial estoppel," and (3) "[t]he choice of law clause is unenforceable under" *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464–465 [11 Cal.Rptr.2d 330, 834 P.2d 1148] (*Nedlloyd*). None of these arguments are persuasive.

The court relied on defendant's last argument as its rationale to deny plaintiff's request for attorney fees. It ruled that "application of Swiss law would contravene California public policy as embodied in [Code of Civil Procedure section] 1021." The court also ruled that "California has a materially greater interest in the determination of this issue than does Switzerland, and that California law would be the applicable law in the absence of the parties' choice of another state's laws."

We disagree with this portion of the trial court's analysis. The *Nedlloyd* court held that choice of law provisions in contracts between

commercial entities *should be enforced*, so long as there is a reasonable basis for the parties' choice of law and the application of the chosen law would not violate public policy. (*Nedlloyd, supra,* 3 Cal.4th at p. 466.) To determine whether a reasonable basis exists for the choice of Swiss law, we consider the transaction at its inception, i.e., at the time the contract was made. This is because "the purpose of requiring that the parties or the contract have some substantial relationship to the chosen state is to assure that the parties have not selected the chosen state's law to avoid the application of the law of a particular state to their transaction by stipulating to the law of a state that has no interest in having its law applied." (*Id.* at p. 482 (conc. & dis. opn. of Kennard, J.).) That purpose, however, is not a relevant consideration when determining whether successors in interest to the original parties are bound by the original choice of law provision. Here, neither of the parties were original signatories to the contract. The successors in interest did not renegotiate the contract. Instead, they bought the contract—*all of it*—in a commercial transaction. They accepted the original contract terms as they found them, without any purpose to avoid local law, but with the purpose of acquiring the benefits and accepting the burdens of a contract negotiated by others.

 The original signatories to the contract were based in Switzerland and France, providing a reasonable basis for *their* selection of Swiss law. That basis need not be revisited. And the Swiss law—the payment of attorney fees to the prevailing party—does not violate California's public policy. Civil Code section 1717 specifically authorizes courts to enforce contractual provisions requiring payment of attorney fees to the prevailing party. And Civil Code section 1717 requires an attorney fees clause to be applied on a reciprocal basis, even where the contract is nonreciprocal. Thus, the prevailing party's entitlement to attorney fees under Swiss law is qualitatively no different than the insertion of a reciprocal, prevailing-party attorney fees clause in a contract, which is clearly enforceable under California law. Moreover, a foreign judgment recognized under the Uniform Foreign-Country Money Judgments Recognition Act (Code Civ. Proc., § 1713) is enforceable in California even when attorney fees awarded under the "English Rule" form the basis for the judgment. (*Java Oil Ltd. v. Sullivan* (2008) 168 Cal.App.4th 1178, 1189–1192 [86 Cal.Rptr.3d 177].)[13]

Had the contract explicitly provided for attorney fees, the trial court would have been required to honor the parties' agreement. Had this dispute resulted in a Swiss judgment, plaintiff could potentially enforce the judgment (which would presumably include attorney fees) in California. The question here, however, is whether the court was required to award attorney fees based on

---

[13] *Java Oil Ltd. v. Sullivan, supra,* 168 Cal.App.4th 1178, was published after briefing was completed, and plaintiff requested the court to take judicial notice of the case in a supplemental filing. We deny the request as unnecessary.

the contract's selection of substantive Swiss law, when the court was first requested to apply such law in postjudgment proceedings—which brings us to defendant's waiver, forfeiture, and judicial estoppel arguments.

■ Although defendant posits three separate doctrines to deny the application of Swiss law, each doctrine depends on the same facts—plaintiff's failure to announce its reliance on Swiss law until it moved postjudgment for an award of attorney fees. "Over the years, cases have used the word [waiver] loosely to describe two related, but distinct, concepts: (1) losing a right by failing to assert it, more precisely called forfeiture; and (2) intentionally relinquishing a known right. '[T]he terms "waiver" and "forfeiture" have long been used interchangeably. The United States Supreme Court recently observed, however: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' " ' " (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371 [58 Cal.Rptr.2d 458, 926 P.2d 438].)

In the language of the "waiver" doctrine, defendant asserts plaintiff's delay in announcing reliance on Swiss law amounted to the intentional relinquishment of a known right after knowledge of the facts. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Phrased as a "forfeiture," defendant contends the assertion of Swiss law was not timely. (*Cowan, supra,* 14 Cal.4th at p. 371.) And phrased as a judicial estoppel, defendant argues plaintiff is precluded from obtaining an advantage by relying on California law for its breach of contract case—then seeking a second advantage by asserting Swiss law for its attorney fees claim. (See *Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986 [12 Cal.Rptr.3d 287, 88 P.3d 24].)

■ Absent an express waiver of the contractual provision, the application of the waiver and judicial estoppel doctrines require a showing of prejudice. Thus, waiver "is a voluntary act and implies an abandonment of a right or privilege—an election to dispense with something of value or to forego some advantage which one might, at his option, have demanded or insisted upon. In no case will a waiver be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to." (*McDanels v. General Ins. Co.* (1934) 1 Cal.App.2d 454, 460 [36 P.2d 829].) Here, there was no *express* waiver of Swiss law; plaintiff never announced an election to rely exclusively on California law. And we do not *infer* a waiver unless it has ripened into an estoppel by reason of prejudice to the adverse party. Likewise, the dual goals of judicial estoppel " ' "are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies." ' " (*Aguilar v. Lerner, supra,* 32 Cal.4th at p. 986.) Thus, the

common theme of these legal doctrines is the prevention of unfairness. With regard to the doctrine of forfeiture, we note only that Swiss law was timely raised with regard to the attorney fee issue.[14] Accordingly, instead of examining this proceeding by making nice distinctions about which doctrine to apply, we simply evaluate whether the record establishes that plaintiff's assertion of Swiss law in the postjudgment motion for attorney fees was unfair to defendant.

Defendant makes no attempt whatsoever to demonstrate factually or legally that it suffered any prejudice or detriment by proceeding through trial under California law without the express invocation of Swiss law. Is there some element of Swiss law that defendant could have applied to its benefit during trial, but which it did not apply because it was somehow misled? Defendant does not say here on appeal, nor did it say in the trial court. When defendant acquired its contract rights under the license agreement, and assumed the concomitant duties, it agreed the contract would be "enforced in accordance with the laws of Switzerland." Without a showing that some prejudice has been suffered by the application of Swiss law to the attorney fees issue, there is no unfairness in holding defendant to its promise.

Moreover, defendant's failure to point to any prejudice is perhaps an acknowledgement that it was *not* misled. After all, plaintiff's complaint prayed for an award of attorney fees, despite the absence of a direct attorney fees clause in the contract. Defendant did not move to strike plaintiff's request for attorney fees in the complaint. And plaintiff's motion for attorney fees included evidence that it had advised defendant *before* trial that plaintiff would be seeking an award of attorney fees under Swiss law. Even more telling is the fact that defendant's prayer for relief in the answer to the complaint requested attorney fees. No unfairness being demonstrated, we reverse the denial of attorney fees and enforce the contract as written. Defendant should pay attorney fees to plaintiff as the prevailing party as determined under Swiss law.

---

[14] Citing *Hurtado v. Superior Court* (1974) 11 Cal.3d 574 [114 Cal.Rptr. 106, 522 P.2d 666], defendant claims plaintiff forfeited the right to rely on Swiss law by failing to "timely invoke" Swiss law. (*Id.* at p. 581 ["generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state"].) But *Hurtado*, which analyzed a conflict of law dispute in a wrongful death action involving Mexican citizens, offers no guidance in the instant case. (*Id.* at pp. 580–581.) *Hurtado* does not discuss or define the point of time at which the invocation of foreign law becomes untimely. In the absence of any showing that the invocation of a Swiss rule of decision would have made any difference in the outcome had it been invoked earlier, the invocation, at the time the Swiss rule *did* make a difference, was timely. *Hurtado* is similarly unhelpful with regard to the choice of Swiss law as the substantive rule of decision. *Hurtado* applied a "governmental interest approach" to decide a choice of law issue in a *tort* action, not involving an greeement by the parties that chose the rule to apply. (*Id.* at pp. 579–582.) In contrast, *Nedlloyd, supra*, 3 Cal.4th 459, provides the appropriate guidance where, as here, the issue is the enforcement of the law *chosen by the parties* as the rule of decision.

## DISPOSITION

For the foregoing reasons, we affirm the judgment and reverse the post-judgment order denying plaintiff's motion for attorney fees. The matter is remanded to the trial court with directions to determine the amount of plaintiff's attorney fees award under Swiss law. Plaintiff shall recover its costs on appeal.

Aronson, Acting P. J., and Fybel, J., concurred.

A petition for a rehearing was denied May 28, 2009, and the opinion was modified to read as printed above. The petition of appellant MP Biomedicals, LLC, for review by the Supreme Court was denied July 29, 2009, S173637. Corrigan, J., did not participate therein.