Filed 10/29/21  Post v. Post CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| CINDY POST,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>TRAVIS POST,<br><br>        Defendant and Respondent. | E073129<br><br>(Super. Ct. No. RIP1600477)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Thomas H. Cahraman, Judge.  Affirmed.

Nett & Nett, Catherine Convy and Amy K. Nett, for Plaintiff and Appellant.

The Law Office of Evan D. Williams and Evan D. Williams, for Defendant and Respondent.

I.

INTRODUCTION

Before he died, decedent James E. Post created the James E. Post Irrevocable

Trust (the Trust). The Trust's only purported asset, and the subject of this lawsuit, is JP

Preferred, LLC (JP). After James's[1] death, his ex-wife, Cindy Post, claimed that JP is the

property of the Estate of James E. Post (the Estate). James and Cindy's son, respondent

Travis Post, is a beneficiary of the Trust and claimed JP is the Trust's property. The

probate court agreed and declared JP to be the Trust's asset.

Cindy appeals. We affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

On May 20, 2010, James created JP, an Alaska limited liability company. James

named himself as JP's only member, manager, and owner.

A few days later, James created the Trust. The Trust is organized under and

governed by the laws of Alaska, and designates James as its "Investment Trustee." It

provides that upon James's death, shares of the Trust are to be distributed to six

beneficiaries. Travis is one of those beneficiaries, but Cindy and the Estate are not.

Section 13.03 of the Trust states, "[t]he Trustees acknowledge the receipt from the

Grantor of the property set forth in the annexed Schedule." Attached to the Trust is a

---

[1] Because the decedent and the parties share the same last name, we refer to them by their first names to avoid confusion. We mean no disrespect.

document entitled "SCHEDULE OF PROPERTY TRANSFERRED," which lists only "JP Preferred, LLC." It identifies no other assets.

James's counsel, Jerry Mark Lobb, testified that he prepared an assignment for James to execute. In Lobb's view, the executed assignment would have formally transferred JP to the Trust in accordance with Alaska law. James, however, never signed the assignment before his death.

Although James and Cindy divorced in 2012, they had an amicable relationship afterwards. James designated Cindy as the executor of the Estate and bequeathed her almost all of his property. After James died in 2016, Cindy, as executor of the Estate, filed a petition under Probate Code sections 850, subdivision(a)(2)(C)[2] and 17200, requesting an order declaring JP an asset of the Estate. Travis objected to the petition on the ground that James transferred JP to the Trust, and requested an order confirming JP as the Trust's asset. The probate court agreed that JP was the Trust's property, denied Cindy's petition, declared JP an asset of the Trust, and entered judgment for Travis. Cindy timely appealed.

---

[2] Probate Code section 850, subdivision (a)(2)(C) allows "[t]he personal representative" to file "a petition requesting that the [probate] court make an order" under the Probate Code "[w]here the decedent died in possession of, or holding title to, real or personal property, and the property or some interest therein is claimed to belong to another." Probate Code section 17200 similarly allows a trust beneficiary to petition the probate court for various orders "concerning the internal affairs of the trust."

III.

DISCUSSION

For a host of reasons discussed below, Cindy argues the probate court erred in finding that JP is the Trust's asset. We conclude the probate court did not err.

A. *Standards of Review*

The interpretation of a statute is a question of law that we review de novo. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212.) The interpretation of the terms of a written instrument, such as a trust, is generally a question of law that we review de novo. (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604.) "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. [Citation.]" (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.) But when the probate court makes findings of fact based on its evaluation of extrinsic evidence, we review those findings for substantial evidence, meaning we resolve any conflicts and draw all legitimate and reasonable inferences in favor of the judgment. (See *Estate of Dodge* (1971) 6 Cal.3d 311, 318.)

B. *Cindy Has Standing*

At the outset, we address and reject Travis's argument that Cindy lacks standing. "'A litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on the merits. [Citation.]'" (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1345.) Although Travis did not argue in the probate court that Cindy lacked standing, "[a] party's standing can be raised at any time in the litigation, even for

4

the first time on appeal." (*Applera Corp. v. MP Biomedicals, LLC* (2009) 173 Cal.App.4th 769, 785.)

Travis contends Cindy's interest in the Trust, if any, was revoked upon her divorce from James under Alaska Statute § 13.12.804. That statute "revokes any beneficiary designations to a former spouse upon divorce unless 'the express terms' of some applicable agreement or court order provide otherwise." (*Snead v. Wright* (D. Alaska 2019) 427 F.Supp.3d 1133, 1138.) Travis thus argues, and Cindy appears to agree, that Cindy lacks standing under Alaska Statute § 13.12.804 to assert any claim to the Trust's assets "unless [she] can show 'proof' that her interests in [James's] Estate were not revoked by [James]."

We disagree. As a beneficiary of the Estate, Cindy is an "interested person" in the Estate and thus has standing to bring this action challenging the Trust's claim to JP. (See (See Prob. Code, §§ 48, subd. (a)(1), 8000, subd. (a); *Schwan v. Permann* (2018) 28 Cal.App.5th 678, 698 [an "'interested person'" has "legal standing to contest the provisions of a will or trust"]; *Estate of Harootenian* (1951) 38 Cal.2d 242, 248 [standing in probate court to challenge a will or trust requires only a prima facie showing of an interest in the estate].)

C. *The Probate Court Had Jurisdiction*

Travis also argues the probate court lacked jurisdiction under Alaska Statute § 13.36.035, subdivision (a). We understand Travis's position to be that the probate court lacked subject-matter jurisdiction because Alaska has exclusive jurisdiction over all

matters related to the Trust. Cindy contends Travis waived his right to raise this "forum non conveniens" argument by failing to assert it in the probate court and failing to exercise his right to bring the case in Alaska under the Trust's choice-of-forum clause.

We disagree. Travis may raise this argument at any time, even for the first time on appeal. (See *Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 369; *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union, Local 16* (1968) 69 Cal.2d 713, 721 [addressing whether action was within exclusive jurisdiction of National Labor Relations Board, which was not raised in probate court].) We nonetheless reject the argument.

Alaska Statute § 13.36.035 "vests the [Alaska] superior court with exclusive jurisdiction over proceedings initiated by interested parties concerning the internal affairs of trusts." (*First National Bank of Anchorage v. State* (Alaska 1995) 902 P.2d 330, 334.) "[P]roceedings that may be maintained" under this provision include "those concerning the administration and distribution of trusts, the declaration of rights, and the determination of other matters involving trustees and beneficiaries of trusts." (A.S., § 13.36.035, subdivision (a).) Without citing any authority or providing any further argument, Travis argues this case "clearly falls" under Alaska Statute § 13.36.035, subdivision (a), and therefore it should be dismissed for lack of jurisdiction.

The parties do not cite, nor can we locate, any authority from Alaska or elsewhere discussing the validity of Alaska Statute § 13.36.035, subdivision (a). But the Alaska Supreme Court held that a similar statute purporting to grant Alaskan courts exclusive

6

jurisdiction over certain claims involving Alaskan trusts could not "unilaterally deprive other state and federal courts of jurisdiction." (*Toni 1 Trust v. Wacker* (Alaska 2018) 413 P.3d 1199, 1201 (*Tangwall*).) In *Tangwall*, a Montana state court issued judgments in favor of William and Barbara Wacker and against Donald Tangwall and his family. (*Ibid*.) Tangwall responded by transferring two pieces of property to a trust created under Alaska law. (*Ibid*.) The Wackers filed an action against Tangwall in Montana state court under Montana law alleging that he fraudulently transferred the property. (*Ibid*.) Tangwall, in turn, filed complaints against the Wackers in federal bankruptcy court and Montana state court. (*Ibid*.) The Montana state court and federal bankruptcy court held that Tangwall's transfers of the property to the Alaska trust were unenforceable. (*Ibid*.)

Tangwall again sued the Wackers, this time in Alaska state court. (*Tangwall*, *supra*, 413 P.3d at p. 1201.) He argued the Alaska superior court had exclusive jurisdiction over the Wackers' fraudulent transfer actions under Alaska Statute § 34.40.110, subdivision (k). (*Ibid*.) That statute, like Alaska Statute § 13.36.035, subdivision (a), provides that the Alaska courts have "exclusive jurisdiction over an action brought under a cause of action or claim for relief that is based on a transfer of property to a trust that is the subject of this section." (A.S. § 34.40.110, subd. (k).)

The Alaska Supreme Court held that § 34.40.110, subdivision (k) could not lawfully strip the Montana state courts or federal bankruptcy courts of jurisdiction over the Wackers' claims. (*Tangwall*, *supra*, 413 P.3d at p. 1201.) As to the Montana courts, the *Tangwall* court relied on the holding in *Tennessee C.I & R. Co. v. George* (1914) 233

7

U.S. 354 at page 360 (*Tennessee Coal*) that "'jurisdiction . . . cannot be defeated by the extraterritorial operation of a statute of another state, even though it created the right of action.'" (*Tangwall*, *supra*, at p. 1203.) The *Tangwall* court recognized *Tennessee Coal*'s holding that states are not compelled "to follow another state's statute claiming exclusive jurisdiction over suits" under the federal Constitution's Full Faith and Credit Clause. (*Tangwall*, *supra*, at p. 1204.)

According to the *Tangwall* court, "[t]he clear implication" of this rule is that "the constitutional argument rejected in *Tennessee Coal* would be even less compelling were a state to assert exclusive jurisdiction over suits based on a cause of action it did *not* create." (*Tangwall*, *supra*, 413 P.3d at p. 1204.) The *Tangwall* court thus rejected Tangwall's argument that Alaska Statute § 34.40.110, subdivision (k) granted the Alaska courts exclusive jurisdiction over the Wackers' Montana state-law claims, reasoning that it was "a more extreme interpretation of the 'full faith and credit' principle . . . rejected in *Tennessee Coal*." (*Tangwall*, *supra*, at p. 1204.) As a result, the *Tangwall* court held that Alaska Statute § 34.40.110, subdivision (k) did not "deprive Montana courts of jurisdiction over cases arising under Montana law," such as the Wackers' case. (*Tangwall*, *supra*, at p. 1204.)

*Tangwall*'s reasoning applies here. Just as Alaska Statute § 34.40.110, subdivision (k) "cannot unilaterally deprive other state and federal courts of jurisdiction," (*Tangwall*, *supra*, 413 P.3d at p. 1201), Alaska Statute § 13.36.035, subdivision (a) cannot strip California courts of jurisdiction to hear cases, like this one, brought in

8

California under the California Probate Code. We therefore reject Travis's argument that the probate court lacked subject-matter jurisdiction.

D. *The Probate Court Properly Confirmed JP Is the Trust's Asset*

The probate court found that JP is a Trust's asset under Alaska law because James "intended to fund, and did fund" the Trust with JP. The parties agree that the probate court properly found that Alaska law governs the issue. They disagree, however, whether the probate court erred in finding that JP is the Trust's asset under the Alaska Supreme Court's decision in *Aiello v. Clark* (Alaska 1984) 680 P.2d 1162 (*Aiello*). We conclude the court did not err.

In *Aiello*, a mother, Fern Palfy, created a trust whose trustees were her and her daughter, Donna Aiello. (*Aiello*, *supra*, 680 P.2d at p. 1164.) Palfy sold a piece of real estate. The promissory note for the property stated that Palfy and Aiello would each receive a one-half interest in the lien on the property. (*Ibid*.) Palfy's trust agreement stated that Palfy transferred to Aiello "the property set forth in Exhibit 'A'" attached to the agreement, which listed only the promissory note for the property. (*Id*. at p. 1167.)

Palfy, purportedly on her behalf and as Aiello's attorney, signed an "Assignment of Beneficial Interest" that transferred Palfy and Aiello's interests in the promissory note to Clark and his daughter, Joyce Clark. (*Aiello*, *supra*, 680 P.2d at p. 1164.) Aiello did not agree to the transfer and was "completely divested of her interest" in the property, so she sued the Clarks to set aside the assignment and recoup her interest. (*Id*. at p. 1164.) The probate court ruled in the Clarks' favor. (*Ibid*.)

9

The Clarks argued the assignment was valid because "no conveyance of the property to the [t]rust was ever made." (*Aiello*, *supra*, 680 P.2d at p. 1165.) Without much difficulty, the Alaska Supreme Court disagreed. (*Ibid.*) The *Aiello* court recognized Palfy's trust agreement stated that she transferred the promissory note to Aiello and that "[a] note may be assigned merely by execution of the trust document." (*Id.* at p. 1167.) The *Aiello* court thus concluded that "a trust was completed as to [Palfy's] one-half interest" in the property and she did not validly assign her interest to the Clarks under the trust agreement's terms. (*Ibid.*) Because "neither Palfy's nor Aiello's interest was properly transferred to the Clarks" under the trust agreement, the *Aiello* court reversed. (*Id.* at p. 1168.)

Although not on all fours with this case, *Aiello* guides our analysis here, particularly given that Cindy cites no Alaska authority more on point. Just as Palfy transferred the promissory note to her trust by explicitly stating in the trust agreement that she was doing so, James transferred JP to the Trust by explicitly stating in the Trust's agreement that he was doing so. Under *Aiello*, this was enough to transfer JP to the Trust, thus rendering it the Trust's asset. We therefore reject Cindy's argument that James had to execute additional documents to validly transfer his interest in JP to the Trust. Had James intended to transfer his interest in JP to his Estate, he would not have expressly transferred it in the Trust's agreement and would not have named six individuals—not Cindy or the Estate—as the Trust's beneficiaries if he wanted Cindy or the Estate to inherit his interest in JP. James's intent to transfer his interest in JP to the

10

trust was apparent from the Trust's terms, which control here.  (See *Aiello*, 680 P.2d at p. 1165.)

Cindy still argues JP should not be considered an asset of the Trust for a series of reasons.  We find none of them persuasive.

Cindy asserts *Aiello* is distinguishable because the promissory note at issue in *Aiello* was "administered" by Palfy's trust while JP was not "administered" by James's Trust.  Cindy fails to explain why this distinction is material and thus fails to persuade us that *Aiello* does not control here.  As the *Aiello* court explained, the *language* of Palfy's trust alone was enough to show that she intended to transfer the promissory note to the trust.  (*Aiello*, *supra*, 680 P.2d at p. 1167.)

Cindy also contends James's transfer of JP to the Trust was invalid because he did not comply with section 7.2 of JP's Operating Agreement (section 7.2).  That provision provides in relevant part:  "Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company, whether now owned or hereinafter acquired unless (1) the other Members unanimously approve the transferee's admission to the Company as Member upon Transfer . . . ."  Cindy argues James's transfer of his interest in JP to the Trust did not comply with this provision because he did not obtain the unanimous consent of all JP members before assigning his interest.  But because James was JP's only member, his consent was all that

11

was required. As we explained, his execution of the Trust shows that he consented to transferring JP to the Trust.[3]

Again pointing to section 7.2, Cindy argues James could not transfer his interest in JP to an irrevocable trust. The relevant portion of section 7.2 states, "Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or a portion of his or her Membership Interest to any *revocable* trust created for the benefit of the Member, or any combination between or among the Member and the Member's spouse." (Italics added.) Although this provision states that a JP member may transfer its interest in JP to a revocable trust, nothing in the provision or elsewhere in the Operating Agreement prohibited James from transferring his interest in JP to an irrevocable trust.

The Operating Agreement also provides that James, as JP's only manager, "shall make all decisions concerning the management of [JP's] business," and further provides that decisions about JP "may be reached through one or more informal consultations followed by agreement among" JP members. Again, because James was JP's only manager and member, his consent was all that was required to comply with these provisions, which allowed him to transfer JP to the Trust.

Yet Cindy maintains that her consent to the transfer was required under the Operating Agreement. She again points to section 7.2 to support her position. Neither

---

[3] Cindy also seems to argue that James could not transfer his interest in JP to the Trust without "an express assignment" because the Trust was created a few days after JP. We do not follow Cindy's argument.

this provision nor anything else in the Operating Agreement says anything about a member spouse's consent being required for the member to transfer his or her interest.

Relatedly, Cindy asserts James could not transfer JP to the Trust without her consent under Family Code section 1100, subdivision (b). But because Cindy did not make this argument in the probate court, she has forfeited it on appeal. (*Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 265.)

Cindy next argues that JP's transfer to the trust was invalid because section 7.8 of the Operating Agreement required the Trust administrator, the Alaska Trust Company, to execute the Operating Agreement, which it did not do. That section states in relevant part: "<u>Substituted Member</u>: Except as expressly permitted under [s]ection 7.2 of this Agreement, a prospective transferee (other than an existing Member) of a Membership Interest *may be admitted as a Member* with respect to such Membership Interest (a 'Substituted Member') only . . . on such prospective transferee's executing a counterpart of this Agreement as a party hereto." The provision thus pertains to whether a transferee may become a member of JP. It does not affect the terms under which James could transfer his interest in JP.

Cindy also relies heavily on the opinion of James's counsel, Mr. Lobb. According to Cindy, Mr. Lobb opined that James invalidly transferred JP to the Trust under Alaska law. But Mr. Lobb, who is not admitted to practice in Alaska, conceded that he was not familiar with applicable Alaska law. Cindy does not identify any Alaska authority Mr. Lobb purportedly relied on to reach his opinions. Mr. Lobb's unsupported opinion does

13

not alter our analysis. (Cf. *Estate of Teed* (1952) 112 Cal.App.2d 638, 646 ["The *ipse dixit* of the most profound expert proves nothing except it finds support upon some adequate foundation."].)

Cindy notes that Mr. Lobb testified that he told James around the time the Trust was created in May 2010 that he needed to execute a written assignment to validly transfer JP to the Trust and that he sent James an assignment to sign. According to Mr. Lobb, the Alaska Trust Company, the administrator of the Trust, would not accept the transfer of JP to the Trust unless and until James executed a written assignment. Mr. Lobb also claimed that a representative from the Alaska Trust Company, Brandon Cintula, told Mr. Lobb that the only asset in the Trust was a $1,000 deposit and that JP had not been accepted as an asset of the Trust. In Cindy's view, the fact that James never executed the written assignment in 2010 shows that he did not intend to transfer his interest in JP to the Trust, because James always signed things immediately.

The evidence on this issue is disputed, and the probate court found that it did not support Cindy's position. We therefore review that finding for substantial evidence. (*Estate of Dodge*, *supra*, 6 Cal.3d at p. 318.)

Mr. Lobb testified on two consecutive days of the trial. The probate court noted that on the first day of trial Mr. Lobb "guess[ed]" that he sent James a written assignment to execute in May 2010, and had "a very skimpy recollection" of whether he followed up with James about executing the assignment. The probate court observed that Mr. Lobb sent James several executed documents for his records in June 2010, about a month after

14

the Trust was formed, and none of them mentions "any formal assignment which still needed to be signed." The court also noted that there is no evidence that James responded to Mr. Lobb requesting any revisions to the documents.

The probate court therefore found that Mr. Lobb's testimony on the second day of his testimony that he counseled James "in detail as to the effect of failing to execute the assignment" conflicted with his prior testimony. The probate court also found Mr. Lobb's testimony was imprecise as to when he supposedly counseled James about executing the assignment because he did not "specify[] whether that was in 2010, 2015, or some other year."

In short, the probate court did not believe Mr. Lobb's testimony that he told James in 2010 that the assignment of JP to the Trust was invalid unless James executed a written assignment and "doubt[ed]" that Mr. Lobb ever sent James a written assignment to execute. As a result, the probate court rejected Cindy's arguments that James refused to execute the written assignment in 2010 and that his alleged refusal to do so showed that he did not intend to transfer JP to the trust.

Beyond his own testimony, there is no evidence that Mr. Lobb sent James a written assignment transferring JP to the Trust for James to execute. There is likewise no evidence James received the written assignment in 2010. We must defer to the probate court's finding that Mr. Lobb's testimony on the issue was not credible. (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)

15

The probate court permissibly found the Trust's language reflects James's "clear intent" to fund the Trust with JP despite Mr. Lobb's testimony that James did not want to transfer—and did not transfer—his interest in JP to the Trust. The probate court thus reasonably rejected Cindy's argument that James intentionally did not execute the assignment because he did not want to transfer JP to the Trust.

Cindy argues that even if the probate court correctly found that James validly transferred JP to the Trust, JP was or should be transferred out of the trust for three reasons. We are not persuaded.

As we understand Cindy's first argument on this point, she contends that James intended to transfer his interest in JP from the trust back to JP's members (i.e., to himself and his estate) through his "subsequent and continual representation" that he was JP's sole owner. Cindy forfeited this argument by failing to assert it in the probate court. (See *Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1216-1217 [issues not raised in probate court forfeited on appeal].)

Second, Cindy argues the probate court erroneously declined to "modify, reform, or terminate" the Trust's terms under Alaska Statutes §§ 13.36.350 and 13.36.345 to reflect James's intent to leave his property to her. Those statutes permit courts to modify, reform, or terminate an irrevocable trust only "[o]n petition by a trustee, settlor or beneficiary" of the irrevocable trust. (Alaska Stats., §§ 13.36.350, subd. (a), 13.36.345, subd. (a).) The statutes do not apply here because Cindy is not a trustee, settlor, or beneficiary of the Trust.

16

Third, Cindy argues the Trust should not be enforced because it violates California public policy. Cindy acknowledges she did not make this argument in the probate court, so we decline to consider it. (See *Karlsson v. Ford Motor Co.*, *supra*, 140 Cal.App.4th at pp. 1216-1217.)

As the probate court succinctly put it, "[t]his case is controlled . . . by [James's] intent at the time of forming and funding the [T]rust." Because the Trust's language shows James's intent to fund the Trust with JP, the probate court correctly found that JP is an asset of the Trust, not the Estate. The probate court therefore properly denied Cindy's petition to confirm JP is an Estate asset and properly granted Travis's request to confirm JP is a Trust asset.

IV.

DISPOSITION

The judgment is affirmed. Travis may recover his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

RAPHAEL
J.

17