Filed 4/13/22  Mike Murphy's Enterprises v. Fineline Industries CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MIKE MURPHY'S ENTERPRISES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> FINELINE INDUSTRIES, INC. et al., <br><br> Defendants and Respondents. | F080048 <br><br> (Super. Ct. No. 16CV01617) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment and orders of the Superior Court of Merced County. Brian L. McCabe, Judge.

Law Offices of Nicholas D. Heimlich, Nicholas D. Heimlich; Heimlich Law and Alan Heimlich for Plaintiff and Appellant.

Quall Cardot, Matthew W. Quall, John M. Cardot and Matthew R. Dardenne for Defendants and Respondents.

-ooOoo-

This is the first of two appeals in the ongoing patent and licensing dispute between appellant Mike Murphy's Enterprises, Inc. (Murphy) and respondents Fineline Industries, Inc. and Fineline Industries, LLC[1] (collectively Fineline). In this appeal, Murphy raises several issues with the trial court's judgment following a trial over payments owed under the license agreement between Murphy and Fineline. Although Murphy succeeded in proving a breach of contract, the trial court rejected the majority of Murphy's claims and theories, made legal rulings and reached factual findings that limited Murphy's damages case, and eventually entered a judgment that only awarded Murphy limited damages on its claims. The trial court then denied Murphy's postjudgment motions to vacate the judgment and for a new trial.

Identifying 16 sometimes overlapping grounds, Murphy now challenges several legal rulings and conclusions along with a number of the factual findings made by the trial court, and again requests a new trial. For the reasons set for the below, we affirm the judgment in part and reverse and remand in part with instructions that the trial court recalculate prejudgment interest.

### FACTUAL AND PROCEDURAL BACKGROUND

Murphy owns and licenses at least two patents and a trademark related to boating technology, which create and control the wakes created by recreational boats. Murphy calls this technology Pure Vert. Fineline builds and sells recreational boats. Fineline was licensed to use Murphy's technology, based on a 2010 license agreement. At the time, Fineline claims it used a different wake control technology called RamFill, which it has continued to use. The dispute in this case appears to have arisen because Fineline began

---

[1] Respondents Fineline Industries, Inc. and Fineline Industries, LLC, are/were California entities with their headquarters in Merced, California. The California Fineline business entities were converted into Fineline Industries, LLC (Fla.) in or about June 2015. Correct Craft, Inc. (a corp. formed in Fla.) then acquired a majority and/or controlling interest in the stock of the Fineline entities. Since the events at issue here occurred, Fineline Industries, Inc. and Fineline Industries, LLC have wrapped up their California activities and dissolved.

using Murphy's Pure Vert technology—also called QuickFill—in a line of boats that previously only used RamFill technology but failed to properly document this fact for purposes of royalty payments under the license agreement. This modification in building practices led to disputes concerning the proper royalties to be paid under the license agreement and eventually to this litigation.

*The License Agreement*

As noted, Murphy and Fineline entered into a 10-year Pure Vert License Agreement with an effective date of April 1, 2010 (the agreement). The agreement contained a page of "Deal Terms," multiple pages of "Standard Terms," and the potential for supplemental pages. (Boldface & some capitalization omitted.) The multiple sets of terms were to be interpreted together as one instrument, "but in case of any inconsistencies the Deal Terms control over the supplemental pages and both of them control over the Standard Terms."

Under the Standard Terms, Fineline was authorized to use Murphy's technology "for manufacture, use, sale and offering for sale of Units in Boats consistent with" the agreement. A "Unit" was defined as "a product made using the Technology," and a "Boat" was defined as "a boat, vessel or watercraft in which a Unit is included." Further, Fineline could "only manufacture Units itself for inclusion in Boats [Fineline] itself manufactures and sells." And Fineline was required to purchase "watertight valves" needed for the technology from a group of known suppliers.

Under the Deal Terms, Fineline received a 10-year, nonexclusive license to the Pure Vert technology. In exchange, Fineline agreed to a "Minimum Annual Royalty" of $1,000 and a "Base Royalty" of $100 "per Boat made during each contract year," which worked to offset the minimum annual royalty. (Boldface omitted.) If Fineline made less than 200 Boats in a year, the base royalty called for "an additional US$50 for each Boat actually made, payable at the end of the contract year." Royalties were due on the

3.

fifteenth day of each calendar month and required accompanying "Statements" as noted in paragraph No. 13 of the Standard Terms.

With respect to the royalties owed, the Standard Terms required Fineline to pay Murphy "the Royalties specified in the Deal Terms." The Standard Terms referenced the minimum annual royalty and explained that Fineline would pay Murphy "the Base Royalty for each Boat manufactured or sold by [Fineline] containing a Unit made using the Technology." "Royalties" were "due and payable for each calendar month during the License Term on or before the day specified in the Deal Terms of the next succeeding calendar month." With the royalties, Fineline was required to submit statements "showing the number, if any, of Units manufactured or sold by [Fineline] during the applicable period, the hull number of each Boat including the Unit, and the calculation of Royalties," even if none were owed that month. Murphy was further preauthorized to check with valve suppliers "to verify the number of Boats using a Unit as reported."

If royalties were late, such royalties would "bear interest at the lesser of the highest legal contract rate or two percent (2%) per month on the unpaid balance," and "any Royalty not paid within fifteen (15) days of its due date [would] bear a late charge of US$50 to cover [Murphy's] reasonably anticipated administrative and billing costs." In addition, Murphy was permitted to audit Fineline's "books and records for all statements and Royalties not previously audited."

In other more or less regularly used terms, Fineline could not "transfer this agreement, assign its rights, delegate it[s] duties, or grant any sublicense, without prior Notice of [Murphy's] consent." Each party was required to "execute, acknowledge and deliver such additional documents as may be necessary or convenient to confirm or enforce the purposes of" the agreement. The document could not be modified "unless it is in writing and signed by both parties." And the prevailing party in any dispute would be entitled to all costs, including reasonable attorney fees.

*The Parties' Dispute Over Royalties and Performance*

In October 2013, Murphy sent Fineline a letter concerning its purchase of watertight valves. Murphy noted valve purchases had more than doubled but royalty payments had decreased. Murphy requested information on what had changed. On November 7, 2013, Fineline responded, explaining they were, indeed, selling more Boats but that not all boats sold included the licensed Murphy technology. Fineline asserted it "has and continues to pay royalties per the agreement."

According to Fineline, at some point after these exchanges, it realized that it had not been properly accounting for manufacturing changes made to one of its boat lines in 2013. These changes had allowed Fineline to include the QuickFill technology in Boats that it was not paying licensing fees on. Fineline undertook an investigation and informed Murphy of the error. Fineline ultimately concluded, around December 2015, that there were approximately 350 Boats for which royalties had not been paid.

At roughly the same time, Fineline received a letter from Murphy detailing its concerns that payments had not and were not being properly made and that Fineline had been sold to Correct Craft, Inc. in violation of the license transfer procedures. After sending this letter, Murphy and Fineline met to discuss the issue. In this discussion, Fineline came to believe it had reached an agreement on a resolution which would involve Fineline paying for the prior Boats and begin paying a reduced royalty rate for Boats that had not previously been royalty bearing based on a new set of patents. In line with its understanding of the agreement, in January 2016, Fineline attempted to pay for the previously unpaid Boats and began sending modified payments on the newly licensed Boats.

However, by March 2016, no formal agreement had been signed by either side. The next communication between the parties appears to have occurred in May 2016, when Murphy requested an audit of Fineline's records pursuant to the terms of the agreement. According to Fineline, the notice did not request specific documents to

5.

review and did not inform Fineline who would attend. When the audit finally occurred, Murphy claims it was denied necessary documents and could not adequately complete the audit. In contrast, Fineline believed it had provided the necessary documents but refused to give Murphy full access to its files.

Following the audit attempt, Murphy notified Fineline that it considered Fineline in breach of the agreement for several reasons and requested slightly more than $75,000. In response, Fineline offered approximately $150,000 to settle the dispute and provided documentation in an attempt to cure the other disputes. But this was not accepted, and shortly thereafter Murphy cancelled the agreement and filed both the present lawsuit and a separate patent infringement lawsuit.

*Pretrial Rulings to Exclude Infringement Testimony and Deny Discovery Request*

Prior to trial, Fineline made two motions which sought to (1) exclude expert testimony from two lawyers and (2) generally preclude evidence of patent infringement claims. Fineline argued that any analysis whether RamFill violated Murphy's patents raised exclusive federal questions that could not be resolved by the state's trial court and otherwise attacked the proposed experts' credentials. Fineline included a copy of the complaint to a related patent infringement action filed in federal court, purportedly covering the disputed technology. Around the same time, Murphy sought to compel further discovery from Fineline concerning Boats sold following termination of the agreement.

The trial court provided a tentative ruling denying Murphy's request for additional discovery on the basis that such information related to future claims of patent litigation, which were outside of the court's jurisdiction. The court thus concluded that such discovery was not reasonably calculated to lead to the discovery of admissible evidence in the lawsuit. At the same time, the court set and later heard argument on Fineline's motion to exclude testimony. Following postargument briefing on the motion to exclude,

6.

the trial court issued a ruling excluding the proposed expert testimony and evidence of patent infringement claims.

Applying the test set forth in *Gunn v. Minton* (2013) 568 U.S. 251, the trial court concluded that Murphy's breach of contract claim concerning RamFill equipped boats necessarily "raises a federal question because in order to determine whether [Fineline] breached the License Agreement as to boats manufactured using RamFill technology, the Court must first make a determination concerning the validity and scope of [Murphy]'s patents and whether [Fineline's] RamFill ballast systems infringe upon said patents." The court further found the patent claims were disputed, that they were substantial to the federal system, and that federal courts could resolve the dispute without disrupting the federal-state balance approved by Congress. The court thus precluded any evidence at trial suggesting RamFill equipped boats were subject to royalties.

*Trial Court's Judgment*

Following trial, the court issued a written ruling and, after objections raised by Murphy, generally adopted that ruling as its final judgment. As Murphy's appeal arises out of the court's decision not to order a new trial or vacate the judgment, and tracks the arguments made in Murphy's objections and motions virtually verbatim, the factual and legal conclusions reached by the trial court provide the foundation for our analysis. Where additional or conflicting facts are relevant, they are generally discussed in the context of the issues raised.

The court began with a section setting forth relevant facts and summarizing the prior procedural history. At a general level, the court detailed the nature of the parties and their licensing dispute, explaining that in "approximately November 2015 [Fineline] notified [Murphy] that, due to an inadvertent error," Fineline "had failed to pay [Murphy] all royalties due and owing under" the agreement. The court noted the parties discussed this error, which was identified by Fineline's internal audit as totaling "approximately $30,000." The court stated that Fineline believed these discussions resolved the dispute,

7.

causing Fineline to send a check for $36,500 to Murphy and to begin paying royalties on Boats containing both QuickFill (Pure Vert) and RamFill technologies, with the royalty for RamFill boats totaling $50 per boat.

Unsatisfied, Murphy sought an audit. However, Murphy alleged that audit failed when Fineline refused to allow Murphy "to copy business records, to remove any business records, or to access electronic documents including QuickBooks and Excel files." Based on what it could review, Murphy sought $53,000 in past-due royalties, not including interest and penalties, and alleged other breaches of the agreement, including failing to name Murphy as an insured and failing to obtain permission to transfer the license among corporate entities. As a result, Murphy terminated the agreement and filed the present lawsuit by June 6, 2016.

The court then reviewed its ruling, discussed above, that it could not hear patent infringement claims as part of the pending lawsuit, before discussing trial issues regarding expert reports and procedural rulings that had delayed final resolution of the issues.

After this background discussion, the court disclosed various factual and legal conclusions regarding the agreement and testimony surrounding the dispute in a section called "Factual Findings."

With respect to the agreement, the court's discussion focused on four principal disputes. First, the court looked at the timing of royalty payments. The court found the agreement ambiguous as to whether the royalty was due when a Boat was manufactured or when it was sold. The court credited testimony showing that a substantial gap could exist between these two dates, that Fineline had consistently paid royalties upon being paid for each Boat without objection, and that the form provided by Murphy for tracking payments contemplated such an arrangement. The court found Murphy's testimony inconsistent but lacking contradiction with the court's findings. Based on the parties'

conduct, the court resolved the ambiguity by finding royalty payments were due on the fifteenth day of the month following a Boat's sale.

Second, the court considered the interest rate owed when a payment was late. Here, referring to the agreement's language that "royalties *not paid when due* will bear interest at the *lesser of* the highest legal contract rate or two percent (2%) per month," the court found there was no ambiguity in the contract and the highest legal contract rate would control if less than 2 percent per month. Looking at Civil Code section 3289, the court found the highest legal rate of interest was 10 percent per annum, and thus concluded that rate applied. In doing so, the court rejected any claim that a usury analysis was relevant to the dispute.

Third, the court considered the late charge provision of the contract, which held that "any *royalty* not paid within fifteen (15) days of its *due date* will bear a late charge of $50." The court found this provision ambiguous as to whether it was $50 charge per Boat or $50 charge per monthly royalty payment. The court found both that the stated reason for the fee—administrative costs—and the parties' practices did not support a $50-charge-per-Boat interpretation and, analogizing the late charge to a credit card bill with multiple charges, concluded the $50 charge applied as a monthly royalty payment.

Fourth, the court considered whether the minimum annual royalty requirement that Fineline make a minimum of 200 Boats per year, with a penalty of $50 per Boat if less were made, remained applicable. The court found persuasive testimony that the parties verbally agreed to modify that requirement on April 8, 2011. The court noted that in 2011 and 2012, only 86 and 177 boats were made, but no minimum annual royalty was paid.

After these four findings, the court discussed its view of critical witness testimony. With respect to Murphy's damages expert, Michael Thompson, the court detailed three admissions it deemed important to its analysis. The first of these was Thompson's concession that his damages calculation was not appropriate and should not be admitted.

The second was that, despite a lack of evidence supporting the assumption, Thompson admitted that he had been instructed to include all boats manufactured in his damages calculations despite only Boats utilizing Murphy's technology being covered. Third, Thompson acknowledged he had improperly based his determination regarding the date of a boat's manufacture on "his 'interpretation' of a California DMV form, a U.S. Coast Guard Boatbuilder's Handbook and the [hull identification number] listed in [Fineline's] document[s]." The court found no credible testimony that the hull identification number could reliably establish the actual manufacture date of a boat.

The court contrasted Thompson's concessions with Fineline's damages expert, Kenneth Wittwer, who the court stated based his analysis "directly on the numbers of boats manufactured as reported by [Fineline]." Based on the evidence, the court found "Wittwer's analysis of the unpaid royalties and accrued interest to be accurate" with one exception, a series of 52 Boats that had been manufactured but not sold at the time the agreement was terminated. The court found such Boats fell within the terms of the agreement's "manufactured or sold" language for royalties and thus concluded that an additional $5,200 in royalties was owed over Wittwer's calculations.

Following these findings, the court turned to the specific causes of action raised in the complaint. First, was the breach of contract claim. The court noted there was one undisputed breach, arising when Fineline admitted to underpaying royalties. The court noted Murphy also alleged breaches based on Fineline allegedly failing to allow an audit, provide a 2011 royalty statement, name Murphy as an insured party, and obtain Murphy's consent when Fineline's ownership structure changed. However, the court found that "the evidence introduced at trial demonstrates that *in each of these instances*, [Murphy] failed to establish by a preponderance of the evidence admitted at trial that *it suffered any damages*" and noted that Murphy either failed to "introduce **any** evidence of damages **at trial**" or introduced evidence that "actually negated the presence of damages." Thus, the remaining breach theories failed.

In discussing the breach of contract claim, the court also considered Fineline's argument that there had been an accord and satisfaction in January 2016. The court rejected this claim, noting there was no evidence Murphy accepted the purported agreement. The court had previously noted, however, that Fineline's conduct after the purported accord fit with its belief that an agreement had been reached.

The court then rejected Murphy's claims for breach of the covenant of good faith and fair dealing, unjust enrichment, and "fraud-concealment." On the breach of the covenant of good faith and fair dealing claim, the court explained the evidence did not show Fineline lied to Murphy regarding their increase in valve purchases and that the evidence showed Murphy was fully aware of the change in ownership that occurred. The court also found Murphy's claims duplicative of the claims for breach of contract. On unjust enrichment, the court found the contract existing (the agreement) between the parties precluded such a claim. And on the "fraud-concealment" claim, the court found the preponderance of the evidence failed to show an intentional fraud, but rather supported Fineline's claim of an inadvertent error that it immediately sought to rectify.

Finally, the court wrapped up its ruling by specifically finding that "during the relevant licensing period, Fineline manufactured 1[,]414 [B]oats which included [Murphy's] PureVert technology" but, due to an error introduced in 2013 with how Fineline identified which boats used that technology, only paid proper royalties for 947 of those Boats. The court thus awarded Murphy $46,700 in royalties, $2,400 in late charges, and $13,836.01 in interest, for a total award of $62,936.01. It specifically reserved the issues of "prevailing party" status, attorney fees and costs, and potential sanctions for later rulings.

The court entered judgment in Murphy's favor on June 25, 2019. On July 9, 2019, Murphy filed motions to vacate the judgment and for a new trial. Murphy appealed on September 20, 2019.

**SCOPE OF THE APPEAL**

This appeal appears to arise from both the trial court's judgment and the denial of Murphy's postjudgment motions to vacate the judgment and for a new trial. Judgment was entered on June 25, 2019. In its notice of appeal, Murphy contends these postjudgment motions, filed July 9, 2019, were denied by operation of law on August 24, 2019. However, Murphy also attaches a minute order dated September 6, 2019, which shows the trial court tentatively denied Murphy's motions on that date. Further, in a second appeal, case No. F080503, where Murphy raises similar issues, part of Murphy's appeal relates to final orders issued in October 2019 on these same motions. Notably, both motions are generally denied by operation of law 75 days after either notice of entry of judgment or notice of the intent to file the motion, depending on the circumstances. (Code Civ. Proc., §§ 660, subd. (c), 663a, subd. (b).)

Neither party discusses whether the motions were actually denied by operation of law or by the trial court's later orders, although a dispute has arisen in the second appeal as to whether the issues raised in this appeal may be heard there as well. Regardless of whether this appeal is timely or premature with respect to Murphy's motions, we construe the notice of appeal in this case to cover the trial court's judgment and the denial of Murphy's motions, to the extent they are appealable. (See *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 135 ["A statutory appeal from a ruling denying a [Code of Civil Procedure ]section 663 motion is indeed distinct from an appeal of a trial court judgment and is permissible without regard to whether the issues raised in the appeal from the denial of the [Code of Civil Procedure ]section 663 motion overlap with issues that were or could have been raised in an appeal of the judgment."]; W*alker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19 ["it has long been settled that an order *denying* a motion for new trial is not independently appealable and may be reviewed only on appeal from the underlying judgment"]; *Bravo v. Ismaj* (2002)

12.

99 Cal.App.4th 211, 219, fn. 6 [notice of appeal filed after telephonic ruling but before final order deemed timely].)

## DISCUSSION

Murphy appears to have generally copied and pasted the arguments it raised in its postjudgment motions, with some citation modifications, into its briefing in this appeal. Murphy's positions are thus framed as attacks on the sufficiency of the evidence, the trial court's legal interpretations of the contract, and the court's conclusions in light of the facts presented at trial. For purposes of continuity with the briefing, this court considers Murphy's arguments in the order raised in its briefing and identifies them by the numbered grounds Murphy utilized, with some arguments combined where reasonable for simpler resolution of the issues.

### *Standards of Review*

The breadth of potential arguments raised means that multiple standards of review apply to the various issues discussed below. This court sets forth the general standards in this section and adds additional discussion where necessary in each argument below.

It is unclear from the argument and framing to what extent Murphy seeks to appeal the denial of his motion to vacate the judgment. A motion to vacate under Code of Civil Procedure section 663 is the proper remedy to be used when "the trial judge draws an incorrect legal conclusion or renders an erroneous judgment upon the facts found by it to exist." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 738.) Because Code of Civil Procedure section 663 is not the proper vehicle for attacking factual findings, any challenges to the trial court's findings of fact are not properly before us on appeal. (*Simac Design, Inc. v. Alciati* (1979) 92 Cal.App.3d 146, 153.) We review questions of law, including whether the trial court applied the correct legal rule, de novo. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.)

With respect to Murphy's arguments asserting insufficient evidence to support the trial court's judgment, we review the sufficiency of the evidence to support a judgment

13.

under the substantial evidence standard. Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible and of solid value. We view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence. We must affirm the judgment if an examination of the entire record viewed in this light discloses substantial evidence to support the judgment. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429; *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633 (*Kuhn*).) Therefore, an order challenged on appeal "is presumed correct and all intendments and presumptions are indulged to support the order on matters to which the record is silent. It is appellants' burden to affirmatively demonstrate error and, where the evidence is in conflict, [the appellate court] will not disturb the trial court's findings." (*Laguna Auto Body v. Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 487.)

Where Murphy raises legal arguments regarding the scope of interpretation of the agreement or relevant statutes, our review is de novo. (See *People v. International Fidelity Ins. Co.* (2010) 185 Cal.App.4th 1391, 1395 ["where the issue is one of statutory construction or contract interpretation, and the evidence is not in dispute, the de novo standard of review applies"].) " 'The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] "The words of a contract are to be understood in their ordinary and popular sense." ' " (*Id*. at p. 1396.)

With these base principles in mind, we turn to Murphy's numbered grounds.

### *Ground No. 1: Insufficient Evidence on Royalties Paid*

Murphy's first ground is that the evidence is insufficient to support the trial court's finding that Fineline paid Murphy $94,700 in royalties for 947 Boats during the agreement. Relying on trial exhibit No. 214, Murphy contends that merely adding up the

14.

checks on that sheet that were written to Murphy, and noted as cleared, limits the total payments to $87,750 and thus precludes the trial court's finding of fact. Relatedly, Murphy argues the $94,700 figure counts checks that were never sent to Murphy or never cleared. We do not agree.

The trial court's judgment shows the court credited Kenneth Wittwer's testimony, Fineline's expert, regarding his calculation of royalties owed and paid. Looking at that testimony, Wittwer relied on multiple exhibits, including exhibit No. 214, along with previous calculations conducted by Murphy's expert, Michael Thompson, who had alleged total payments of $87,700. Notably, it appears that Murphy's counsel chose not to cross-examine Wittwer regarding his $94,700 calculation, relying solely on its exhibit No. 214 arguments in posttrial briefing to argue the opinion was unsupportable. There is thus no record evidence explaining why the checks relied upon by Wittwer could not be counted, only counsel's claims such a conclusion is self-evident. There is no indication in the record that Wittwer could not have explained the discrepancy. Indeed, in cross-examination related to Thompson, the record shows that some checks Fineline issued to Murphy may not have been accounted for in exhibit No. 214 or in Thompson's calculation of the $87,700 figure. Nor does the claim that Murphy had not cashed a check issued to it dispositive of whether Fineline paid a royalty to Murphy, as it would be odd to permit Murphy to collect on allegations it created by failing to cash payments. Ultimately, Murphy's counsel provides no reason why the trial court could not credit Wittwer's testimony over the document cited by counsel as conflicting with it. (See *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1407 (*Plastic Pipe*) ["The uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable."]; *Kuhn*, *supra*, 22 Cal.App.4th at pp. 1632–1633 ["one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences"].)

15.

## *Ground No. 2:  Interest Clause Interpretation*

Murphy's second ground is that the trial court made a legal error when interpreting the agreement to provide for a 10 percent rate of interest.  Murphy argues that the agreement should be read to provide for a 24 percent rate of interest unless such a rate is deemed usurious.  We do not agree.

As noted, the relevant contractual term provides that late Royalties will "bear interest at the lesser of the highest legal contract rate or two percent (2%) per month on the unpaid balance."  The trial court reviewed this provision and found no ambiguity in its language.  Thus, the court concluded the proper interest to apply would be the lesser of either 2 percent per month or the legal rate of interest on breached contracts.  It found that legal rate to be 10 percent per annum based on Civil Code section 3289.  Civil Code section 3289 provides in relevant part that "(a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof …" and that "(b) If a contract … does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

Murphy functionally argues that Civil Code section 3289's interest rate is inapplicable because the parties stipulated to a rate of interest of 2 percent per month, a rate Murphy contends is legal under the usury laws.  However, as the trial court noted, the plain language of the agreement indicates the parties stipulated to the lesser of either the "highest legal contract rate" or a rate of 2 percent per month.  Nothing in Civil Code section 3289, subdivision (a) indicates that the parties cannot stipulate to the interest rate stated in Civil Code section 3289, subdivision (b) as their legal rate of interest.  However, this raises the question whether the parties did, in fact, do such a thing.

The trial court's ruling demonstrates its belief that the plain language of the agreement necessarily references Civil Code section 3289.  We agree.  Under the California Constitution, interest rates on judgments are legally set at 7 percent per annum.  (See *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342,

16.

346 [detailing amendment history].)  However, Civil Code section 3289 sets a higher rate specifically for breach of contract claims at 10 percent per annum.  (Civ. Code, § 3289, subd. (b).)  Thus, under California law, the highest legal contract rate set by the state is 10 percent per annum.  A contract provision referencing use of the lesser of the highest legal contract rate or 2 percent per month unambiguously refers, although indirectly, to Civil Code section 3289's 10 percent per annum rate because this is the highest legal contract rate under our state's laws.

We note, however, that even if we found ambiguity, we would construe the agreement in the same manner.  The intent of the parties as expressed in the plain language of the agreement was to use the lesser of two known rates.  Even if "highest legal contract rate" was ambiguous as to its actual figure, the overall intent of the parties to select a known rate would compel this court to apply Civil Code section 3289's rate.  Further, even if such an intent were not evident, the lack of extrinsic evidence on any other intended meaning for selecting the lesser of two rates and the obligation to construe ambiguous terms against their drafter would also support the conclusion that Civil Code section 3289's 10 percent per annum rate was appliable.  (See *Rainier Credit Co. v. Western Alliance Corp.* (1985) 171 Cal.App.3d 255, 264 [where extrinsic evidence does not resolve dispute, ambiguous terms are construed against the drafter].)

Accordingly, we find no error in the trial court's determination that a 10 percent per annum interest rate was applicable to any late royalties.  Like the trial court, we thus need not engage in a usury analysis to determine whether the proposed 2 percent per month interest rate was legal.

### Grounds Nos. 3 and 4:  Time That Interest Accrues

As noted above, the trial court's judgment awarded Murphy $13,836.01 in interest through the date of judgment.  Murphy's third ground contends the trial court lacked substantial evidence to support the amount of prejudgment interest awarded.  Murphy's

fourth ground contends the trial court made a legal error in limiting the period in which interest could accrue.

Murphy contends the trial court determined that slightly less than three year's interest accrued, and the court improperly ceased counting interest sometime in 2017. Fineline responds, essentially supporting this theory, but arguing based on testimonial evidence that the interest cutoff occurred because the court concluded an offer sufficient to cease the accrual of interest under Civil Code section 1504 arose on June 3, 2016. To this Murphy replies that the court never once discussed Civil Code section 1504, specifically reserved the issue of whether a full tender occurred but never returned to it, did not admit the actual offer into evidence, and specifically found there was no accord and satisfaction on June 3, 2016, because Murphy did not accept the terms discussed at that time.

The record and arguments presented to this court fail to support either theory presented. The only testimony regarding interest due supporting the trial court's determination came from Wittwer. In that testimony, Wittwer ceased calculating interest on June 3, 2016, based on the disputed settlement offer. His total interest owed based on that date was only $5,739 and did not include 52 disputed Boats included in the court's final determination. If the court had found a valid settlement offer under Civil Code section 1504 arose on June 3, 2016, it appears there was a valid evidentiary basis to award roughly $6,000 in interest for the three-year period (2013–2016) analyzed by Wittwer when including some interest on the remaining 52 boats. Yet the trial court awarded more than double that amount. This ruling appears to contradict both Murphy's theory that less than three years of interest were awarded and Fineline's theory that interest ceased on June 3, 2016.

While this court can envision calculations that come reasonably close to the court's final order, none allow this court to identify how the trial court reached its figure. Regardless, this court is not obligated to independently check the trial court's math.

18.

Rather, the question is whether any substantial evidence supports the figure reached. In this analysis, neither party has pointed this court to evidence from which reasonable inferences could be drawn to support the final interest calculation. Further, upon review of the record, this court has been unable to independently identify evidence supporting the trial court's interest calculation. With no identified evidence supporting a reasonable inference that the trial court correctly calculated interest, the award cannot stand. (*Kuhn*, *supra*, 22 Cal.App.4th at p. 1633 ["While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]."].)

### *Grounds Nos. 5 and 6: Contract Interpretation Based on Course of Conduct Rulings*

Murphy's fifth and sixth grounds argue the trial court improperly interpreted the agreement when it found the parties' course of conduct informed how it should resolve ambiguous provisions. This argument covers two of the trial court's interpretations of the agreement. First, the court found that the agreement was ambiguous with respect to the timing of royalty payments based on the "manufactured or sold" language of the Standard Terms. Here the court concluded that the parties' course of conduct in paying and accepting without objection royalties based on when Fineline sold the Boat, coupled with the royalty-reporting document generated by Murphy, supported a reading that royalties were due 15 days after Fineline was paid for a Boat it sold. Second, the court found the contract was ambiguous with respect to whether the $50 administrative late charge was a per-Boat or per-royalty-report charge. Here, the court found both that the stated reason for the charge and the parties' practices did not support a $50-per-Boat interpretation and concluded the $50 charge applied as monthly royalty payment.

Murphy challenges both findings as contrary to the terms of the agreement and thus suggests a de novo review is appropriate. Fineline responds that the true issue here is a resolution of a factual dispute regarding the meaning of extrinsic evidence and,

19.

therefore, our review is for substantial evidence. We need not resolve that dispute as, under either standard of review, we conclude the trial court correctly identified and resolved an ambiguity in the agreement for both claims.

*"Manufactured or Sold" Dispute*

Looking first at the "manufactured or sold" language, Murphy contends the agreement's Deal Terms refer only to Boats "made" and thus controls under the express terms of the agreement. Murphy then argues that any interpretation other than payment when a Boat is made is unreasonable, as there could be substantial delays in payment or problems with promotional or leased Boats.

As noted, the Deal Terms provide for a minimum annual royalty of $1,000, due on the anniversary of the agreement with a base royalty of $100 "per Boat made during each contract year [¶] [p]rovided, if [Fineline] makes less than 200 Boats per contract year" an additional $50 per Boat will be paid "at the end of the contract year." Further, royalties are owed on the fifteenth day of every month and should be accompanied by statements as noted in paragraph No. 13 of the Standard Terms. The Standard Terms, in turn, provide that these monthly statements must show "the number, if any, of Units manufactured or sold by [Fineline] during the applicable period," along with additional information. Additional terms in paragraph No. 12 of the Standard Terms explain that royalties are to be paid "for each calendar month during the License Term on or before the day specified in the Deal Terms of the next succeeding calendar month."

Taken together, we agree with the trial court that the relevant terms do not clearly state whether monthly royalty payments must be made on all Boats manufactured, all Boats sold, or some ratio between the two. It is true that the Deal Terms speak of Boats sold, but this is only in the context of annual license terms and the minimum royalties owed. The Deal Terms make no reference to the calculation of monthly payments. Rather, the Deal Terms refer the reader to the Standard Terms, which discuss payments on Boats "manufactured or sold" and to Murphy's statement form, which calls itself a

20.

"Sales Form" and seeks a "Monthly Sales Report." There is thus an ambiguity regarding the Boats that require a monthly royalty payment. The agreement calls for a payment on Boats "manufactured or sold," while the relevant forms only request information on Boats sold. That the Deal Terms care about total number of Boats made in the context of annual minimum royalty payments provides no insight into what the parties intended with respect to ongoing payments made to meet that annual requirement while it existed.

In resolving this ambiguity, the record evidence strongly supports the trial court's ruling. As noted, the statement form provided by Murphy is focused on Boat sales. Further, the record shows that Murphy had received royalty reports from Fineline in the past that noted both when Fineline was paid and when it subsequently paid the royalty required. This payment structure continued for multiple years without objection, until this present dispute arose.

We thus agree with the trial court's conclusion that the parties' course of conduct in this case supports reading the agreement to require monthly royalty payments on boats sold. " 'The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions.' " (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 921.) Indeed, when a contract is ambiguous " 'a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning … will, when reasonable, be adopted and enforced by the court.' " (*Ibid.*) Murphy's conduct requested monthly reporting on sales and Fineline provided information to Murphy that it was paying royalties based on sale dates. Thus, we find no error in construing the agreement to require monthly royalty payments on Boats sold.

Nor are we persuaded by Murphy's claims such a construction is illogical. When an agreement originally calls for minimum annual royalty payments for Boats made, but requests monthly royalty payments for Boats manufactured or sold, it is neither unreasonable nor unwieldy to make monthly royalty payments on the Boats sold. If

21.

enough Boats are sold to meet the minimum, the practice can carry from year to year without affecting Fineline's ability to pay royalties should Boats not sell quickly. And, at the conclusion of the agreement or in any dispute, Murphy can still collect on manufactured Boats which had not yet had a royalty paid under the monthly system. Nothing about such an arrangement counsels against the construction adopted.

*Administrative Late Charge Dispute*

Murphy next argues the trial court's determination that the $50 late charge was per royalty period and not per Boat was not supported by the agreement's language and, even if it was, the court erred in limiting the period of late charges to 48 months, as opposed to 72 months. We do not agree. Notably, Murphy's arguments contain little if any discussion of the agreement or the record and only provide generalized record citations in support of its claims.[2]

Under the agreement, Fineline was required to pay Murphy "the Royalties specified in the Deal Terms." "Royalties" were thus implied to include both the minimum annual royalty and the base royalty, with the base royalty being "due and payable for each calendar month during the License Term on or before the day specified in the Deal Terms of the next succeeding calendar month," meaning the fifteenth day of the next month, as discussed above. If royalties were late, the agreement provided that "any Royalty not paid within fifteen (15) days of its due date will bear a late charge of US$50 to cover [Murphy's] reasonably anticipated administrative and billing costs."

---

[2]     This lack of adequate citation and argument issue is pervasive throughout Murphy's briefing. Further, much of Murphy's opening brief could be considered a virtual cut and paste of its filings before the trial court, with updated citations to the appellate record. Murphy's reply brief often simply points back to the opening brief with no meaningful additional discussion. Although this court has worked to consider all of Murphy's arguments, it would have been within its authority to deem several of them forfeited. (See *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 497–498 [" 'We may and do "disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." ' "].)

22.

As the trial court noted, and we also conclude, this late charge mechanism is ambiguous with respect to whether it applies per Boat or per monthly payment. While it is correct that all Boats sold generate a royalty each month, the agreement itself appears to define the capitalized term "Royalty" as covering both the minimum annual royalty and the base royalty. As the base royalty is paid in monthly installments, and the minimum annual royalty is paid at the conclusion of the contract year, a late charge on either would reasonably appear to be a single charge—not a per Boat charge.

To resolve this ambiguity, the trial court looked to the fact that Murphy never sought a per-Boat late charge and that Fineline stated it would never have agreed to such a structure. As noted above, the record does show that Fineline provided Murphy with records showing Boats were being paid once they were sold. These same documents also identified several Boats that had been manufactured but not yet sold, and thus royalty payments were not paid in one month but were paid in the next month. As the trial court noted, the record shows no indication of an objection to this practice by Murphy. Accordingly, both because the most natural language of the agreement suggests late charges are based per "Royalty" payment, not per Boat, and the parties' course of conduct shows no indication a per-Boat late charge was contemplated, we find no error in the trial court's construction of the term.[3]

### *Grounds Nos. 7, 8, and 9: Hull Identification Numbers Issues*

Murphy's seventh, eighth, and ninth grounds all consider issues surrounding the hull identification numbers that Murphy attempted to utilize to prove the manufacture

---

[3]    Murphy appears to allege there is also a lack of evidence supporting 48 late or unpaid monthly royalty payments. However, the record shows this figure was the uncontested number calculated and presented in Wittwer's testimony. Such testimony is substantial evidence of the late charges owed. (*Plastic Pipe*, *supra*, 124 Cal.App.4th at p. 1407 ["The uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable."]; *Kuhn*, *supra*, 22 Cal.App.4th at pp. 1632–1633 ["one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences"].)

23.

date of each boat alleged to be royalty bearing. In ground No. 7, Murphy argues the trial court wrongly discredited Thompson's testimony on when boats were manufactured because he relied on hull identification numbers to make that determination. In ground No. 8, Murphy states the trial court's statements on when boats were manufactured was wrong because it failed to take judicial notice of the meaning of hull identification numbers and failed to recognize that the parties' agreed on that meaning. In ground No. 9, Murphy contends the trial court failed to take judicial notice of official government documents relating to the meaning of hull identification numbers. For each of these arguments, Murphy believes the trial court's calculation of interest and late charges was affected based on Murphy's claim that payments, and thus late charges and interest, were triggered by the date of manufacture and not the date of sale.

We note that there appears to be no error in the trial court's rulings in this instance. The trial court's judgment clearly indicates that it was aware of and considered the various documents Fineline alleges it did not take judicial notice of. The trial court also specifically noted Thompson's testimony regarding the meaning of hull identification numbers and their relation to manufacture dates. However, the court rejected that testimony because "[n]either of [Murphy's] witnesses credibly testified that such information enabled [Murphy] to establish the actual manufacture date of a boat." As Fineline notes, contradictory testimony indicated that hull identification numbers may be requested and assigned well before boats are manufactured. Murphy makes no argument that the trial court could not rely on this testimony. (See *Plastic Pipe*, *supra*, 124 Cal.App.4th at p. 1407 ["The uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable."]; *Kuhn*, *supra*, 22 Cal.App.4th at pp. 1632–1633 ["one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences"].)

24.

More importantly, however, this court's resolution of the issues above, affirming that the agreement was properly interpreted to determine that royalties were not owed as of the date of manufacture, but rather at the time of sale according to the parties' course of conduct, means that none of the issues raised by Murphy here constitute reversible error. Even if the trial court erred in excluding evidence regarding the date of manufacture, such evidence would not affect the judgment entered as the date of manufacture is not the trigger for calculating late charges or interest. (See Evid. Code, § 354 ["[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice"].)

*Ground No. 10:  Insufficient Evidence Regarding the Total Number of Boats*

Murphy's tenth ground, mirroring in purpose its first, is that the evidence is insufficient to support the trial court's finding that royalties were owed on 1,414 Boats. Murphy argues the correct number is 1,446 and that this number is readily derived from Fineline's verified document production. For the same reasons stated in ground No. 1, we do not agree.

At trial, Wittwer discussed the fact that he had counted a total of 1,362 Boats subject to potential royalty payments. Wittwer also noted that his final calculations excluded 52 Boats that had been manufactured but not yet sold from his final royalty calculations, meaning his calculations covered only 1,307 Boats. In his testimony, Wittwer specifically noted that Thompson had calculated a total of 1,446 Boats, the same number Murphy contends is correct, and explained that in his review of the records he found that number incorrect because around 80 of those Boats were actually marked as RamFill boats, not QuickFill Boats in the underlying documentation. Ultimately, the trial court could credit Wittwer's testimony and utilize that to form the basis for its damages calculation. (*Plastic Pipe*, *supra*, 124 Cal.App.4th at p. 1407 ["The uncorroborated

25.

testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable."]; *Kuhn*, *supra*, 22 Cal.App.4th at pp. 1632–1633 ["one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences"].)

Further, to the extent any discrepancy arose between Wittwer's testimony and the final damages figure, it appears the trial court overcounted the royalties owed. As noted, Wittwer included the 52 manufactured but unsold Boats in his total, but not his royalty calculations. The court appears to have added those 52 Boats back into the original total to reach its figure of 1,414, despite Wittwer's calculations already including them. Thus, even if an error existed, it was not one which harmed Murphy. That is not to say the discrepancy is an error. Rather, given the range of expert opinions on the total number of Boats for which royalties were owed, substantial evidence supports the court's reasonable determination of the final number, even if it did not precisely match either expert.

' "Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." ' " (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 398–399.) Ultimately, "[i]t is of no moment that the jury's lost profits calculation ultimately did not precisely match any of the figures testified to by the parties' experts. As one court has noted about a jury's determination of economic damages based on expert testimony, 'between black and white are various shades of gray, and all of the colors of the rainbow as well' and '[w]e refuse to transform the jury's inherently subjective task of calculating damages into a mechanical exercise of voting to accept or reject the testimony of any witness in toto.' " (*Id*. at p. 401, first bracketed insertion added.)

## _Ground No. 11: Insufficient Evidence to Exclude RamFill Boats_

Murphy's eleventh ground focuses upon the trial court's calculation of royalties only on Boats marked as "QF" (those adopting the QuickFill technology) in the record. Murphy appears to argue that the record at trial did not support this conclusion because it "was not consistent with the facts presented prior to trial" during the parties' dispute over expert testimony on patent infringement. Murphy states the trial court "made a contract decision without even hearing testimony from relevant experts or even factual witnesses regarding QF vs. RF," thus resulting in a loss of damages on "RF" boats (those including the preexisting RamFill technology). Fineline responds that this issue raises subject matter jurisdiction issues and that the trial court's determination that resolving whether "RF" boats were part of the agreement because they included Murphy's technology should be presumed correct. In reply, Murphy attempts to raise a due process allegation, arguing a hearing on the scope of the agreement was needed, apparently after the trial court's ruling on the expert testimony dispute, because the parties' course of conduct shows Fineline had been paying on "RF" boats since 2013.[4]

Murphy's arguments on appeal do not challenge the legal basis for the trial court entering its order limiting expert testimony on patent infringement issues. The agreement called for royalties on Boats that incorporate Murphy's patented technology. As the trial court noted in its ruling to exclude expert testimony and in its summary of that ruling in its final judgment, whether Fineline's RamFill product, which existed prior to the agreement, incorporated Murphy's patented technology was a heavily disputed issue both in the present lawsuit and in Murphy's parallel patent infringement case filed in the federal court.

---

[4] Murphy's reply brief contains no citations to the record to support its claim that Fineline had been paying royalties on "RF" boats since 2013.

To the extent Murphy's claim required patent infringement proof to demonstrate a breach of the agreement, this court has little doubt that patent law would be a necessary element of Murphy's breach claim, meaning exclusive federal jurisdiction would exist. (See *Christianson v. Colt Industries Operating Corp.* (1988) 486 U.S. 800, 808–809, ["[Title 28 United States Code section ]1338(a) jurisdiction ... extend[s] only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims."].)  Such a claim would raise a specific patent law question on infringement, namely whether products sold by Fineline "were licensed products as defined in the agreement (which requires the determination of whether the products utilized the patented claims and processes referenced in the agreement)." (*Applera Corp. v. MP Biomedicals, LLC* (2009) 173 Cal.App.4th 769, 784.)

Critically, there is a vast difference in this case between a limited allegation that some agreed-upon products were not properly paid for and an allegation that a substantial swath of disputed products utilized technology covered by one or more of Murphy's patent claims and thus required royalty payments despite a prior history showing no payments or royalty reports on such products from the outset of the agreement.  If the first view were adopted, there would be little basis to differentiate the analysis from cases like *Applera Corp.*, which found state jurisdiction could exist over breach of contract claims because "the breach could consist merely of the failure to pay royalties concurrently with the submission of a royalty report in which defendant acknowledges the sale of products covered by the license." (*Applera Corp. v. MP Biomedicals, LLC*, *supra*, 173 Cal.App.4th at p. 784.)  Instead, were the patent infringement theory to predominate, the claim would more properly align with cases such as *Scherbatskoy v. Halliburton Co.* (5th Cir. 1997) 125 F.3d 288, 291, where the underlying breach claim necessarily required proof of infringement to trigger a royalty payment.  (See *U.S.*

28.

*Valves, Inc. v. Dray* (7th Cir. 1999) 190 F.3d 811, 814 ["The only way to tell whether a valve is covered by the licensed patents is to apply substantive patent law. Moreover, the only means by which to fix damages is to evaluate each valve sold, and determine whether that valve is an infringing valve. As in *Scherbatskoy*, whether a breach occurred depends on whether Dray infringed the licensed patents, and this issue 'requires the application of the federal patent laws.' "].) Such an action would necessarily require claim construction and thus could result in substantial forward-looking and real-world consequences, particularly with respect to future infringement suits related to the patents. (See *Jang v. Boston Scientific Corp.* (Fed. Cir. 2014) 767 F.3d 1334, 1337–1338 [noting patent issues were not substantial under controlling law where questions were " 'backward-looking' and 'hypothetical' " but finding exclusive appellate jurisdiction necessary for "claims based on underlying ongoing royalty obligations" because they raise "real-world potential for subsequently arising infringement suits," future invalidity disputes, and inter-circuit confusion].)

The court's rulings in this case considered the potential scope of the claim raised and concluded, in line with Fineline's arguments, that Murphy could not pursue a state court claim that boats that were not previously subject to royalty payments were infringing and thus subject to the royalty structure. It did so based on the conclusion that such a claim necessarily raised substantial disputed patent issues in in a way that would divest the trial court of jurisdiction over the claim under Title 28 United States Code section 1338. In line with this conclusion, the trial court determined that expert evidence indicating that any boats infringed Murphy's patents and thus were covered by the agreement was improper because such assertions were not covered by the claim.

At trial, then, a core question arose regarding what boats were, in fact, covered by the agreement. It appears from Murphy's arguments, that Murphy alleges a lack of factual evidence supporting the conclusion that only "QF" marked Boats were within the

29.

scope of the agreement. We do not agree the evidence presented was insufficient to support this conclusion.

The record shows that Fineline admitted its Boats marked with a "QF" designation were designed and manufactured utilizing the licensed technology. Moreover, the record included evidence that Fineline had been paying only on "QF" Boats without objection from Murphy and that it calculated potential royalties based on the "QF" designation and a review of each purchase. In contrast, the only evidence this court has located with respect to payments on "RF" boats arose in the context of payments made after the purported 2016 settlement that the trial court specifically concluded was acted upon by Fineline but not accepted by Murphy.

With no direct challenge to the trial court's ruling that Murphy's breach of contract claim could not include allegations of patent infringement, any attempt to include boats within the royalty payments owed turned on the parties' intent and practice under the agreement. As noted, the evidence left no doubt that "QF" Boats—those adopting the QuickFill technology—were intended to and were generally included within the payments made by Fineline. However, with respect to "RF" boats—those including the preexisting RamFill technology—Murphy appears to have marshalled no evidence supporting a claim that the parties intended or actually included "RF" boats in the agreement prior to 2016. Further, with respect to payments made after 2016, and as further discussed in ground No. 13, the evidence supported the trial court's conclusion that these payments were not an indication that "RF" boats were included in the original agreement. This evidentiary support is sufficient evidence for the trial court's determination that "QF" Boats were included within the agreement, while "RF" boats were not. (See *Plastic Pipe*, *supra*, 124 Cal.App.4th at p. 1407 ["The uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable."]; *Kuhn*, *supra*, 22 Cal.App.4th at pp. 1632–1633 ["one must

30.

resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences"].)

Similarly, we see no evidence of a due process violation due to a lack of opportunity to be heard. The trial court heard Fineline's motion and Murphy's opposition and ruled in Fineline's favor. That this ruling limited the scope of recovery under the agreement does not mean it defined the scope of the patent, as Murphy argues. Rather, the court's ruling left open the possibility that Murphy could pursue its patent infringement claims on "RF" boats in the federal litigation while still pursuing its state law breach of contract claim on the "QF" Boats.

## Ground No. 12:  Insufficient Evidence Regarding the Total Number of Boats Manufactured

Murphy's twelfth ground challenges the trial court's discovery ruling that precluded Murphy from obtaining evidence of boats being manufactured after it terminated the agreement. As noted above, the trial court denied Murphy's request on the basis that such information related to future claims of patent litigation, which were outside of the court's jurisdiction. For this reason, the court concluded that such discovery was not reasonably calculated to lead to the discovery of admissible evidence in the lawsuit. Murphy now argues that such discovery was necessary because Fineline may have begun manufacturing infringing boats prior to the termination of the agreement but not have sold them until after. According to Murphy, the court's decision to include the additional 52 Boats identified as manufactured but not sold prior to termination confirms the need for such discovery.

A trial court's discovery rulings are reviewed for abuse of discretion. (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1612.) Upon review, we see no evidence of an abuse of discretion in limiting discovery to products manufactured or sold within the terms of the agreement. While Murphy argues additional discovery was required to determine whether more boats were royalty bearing given the court's award of royalties

31.

on Boats manufactured but not sold before the termination of the agreement, this claim does not logically follow from the court's actions. Murphy makes no claim that the court limited discovery to only Boats sold during the relevant period, which is why Murphy was able to identify Boats that began the manufacturing process prior to termination but did not complete it until after. The court, recognizing the ambiguity in the license payment terms discussed above, then awarded Murphy royalties on all Boats manufactured but not sold prior to termination. Any boats manufactured following the termination of the agreement would not be subject to the breach of contract claim and thus, irrelevant to the litigation. As the court ruled, discovery on such products would not lead to the discovery of admissible evidence.

## *Ground No. 13: Insufficient Evidence of Modified Licensing Agreement*

Murphy's thirteenth ground is practically unintelligible. Murphy leads by baldly stating any review on this claim should be conducted de novo. Murphy then states, citing only to the judgment, that the "Court's judgment that there was a modified licensing agreement (Exhibit 114, Judgment p. 6: 5-13) is not consistent with and/or is not supported by the facts." Murphy then suggests this is somehow related to a $21,000 payment Fineline sent to Murphy, claiming that Fineline stopped the payment, before concluding that the error led to inadequate damages and an insufficiency of the evidence to justify the decision as a result.

The complete lack of discussion and analysis makes it difficult to comprehend what result Murphy seeks from this argument. The court properly ruled it could not hear patent litigation disputes and, based on the evidence presented, found that Boats marked "QF" were subject to the original agreement but that boats marked "RF" were not. Murphy's apparent attempt to show that "RF" boats were part of the original contract was rejected because such payments only arose after a discussion that the court concluded did not result in an accord and satisfaction but did result in the Fineline modifying its conduct as if an agreement had been reached. That the court identified this change as a point

32.

where "the parties negotiated and began to perform a modified 'licensing agreement' related to boats manufactured with **both**" technologies is of no import to the ultimate issue resolved by the court. Further, it is fully supported by the testimonial and documentary evidence showing negotiations occurred and that Fineline did indeed begin sending specific payments for "RF" boats. Thus, regardless of the precise intent in Murphy challenging the court's description of this event, and regardless of whether this court reviews that finding de novo or for substantial evidence, the court sees no error.

## Ground No. 14: Insufficient Evidence of RamFill Payments

Murphy's fourteenth ground continues the theme of the thirteenth ground, but this time Murphy argues the trial court had no evidence to support its statement that Fineline paid Murphy $7,450 for RamFill boats manufactured after January 2016. As with Murphy's other evidentiary arguments, Murphy points to a single document it claims is dispositive of this claim while ignoring the testimony from, at a minimum, Wittwer, that supports the trial court's statement. This testimony is substantial evidence supporting the trial court's finding. (*Plastic Pipe*, *supra*, 124 Cal.App.4th at p. 1407 ["The uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable."]; *Kuhn*, *supra*, 22 Cal.App.4th at pp. 1632–1633 ["one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences"].)

## Ground No. 15: Insufficient Evidence Regarding Who First Noticed the Error

Murphy's fifteenth ground takes issue with its belief that the trial court's judgment implies Fineline was the first to discover any error in royalty payments. Pointing to the judgment where the court stated that Fineline had not noticed any error at the time Murphy first reached out, Murphy argues this conclusion was proved false by the trial. Murphy then claims this error in the trial court's understanding "resulted in inadequate damages," with no explanation of how. Murphy's argument is not persuasive. As best this court can tell, this argument seems to support a claim that the trial court wrongly

found no fraudulent conduct or breach of the covenant of good faith and fair dealing by Fineline. However, the court's ruling did not turn in any way on who first determined that there was an error or whether or not Fineline "tried to blow off [Murphy]" without an investigation. Rather, the court explained that despite any dispute on that point it was convinced that when Fineline learned of an actual error it reported it and worked diligently to cure it. Further, the trial court's statement that Fineline did not know of the error at the time Murphy first reached out was supported by witness testimony that Fineline did not discover the error until approximately October 2015.

### *Ground No. 16: Insufficient Evidence Regarding Audit Damages*

Murphy's sixteenth and final ground, contends the trial court incorrectly concluded there were no damages proven with respect to the "failed audit" breach theory. Murphy points to the fact it paid for the audit as evidence of damages arising from "the breach." We do not find reversible error.

Initially, this court notes that Murphy's argument relies on a claim damages arose from the costs associated with its choice to conduct an audit. But the trial court's holding was that Murphy had failed to identify any damages arising from its claim that the actions Fineline took when Murphy was conducting the audit were a breach. In other words, as the court noted, the figures claimed as damages were inherently part of the audit right. In fact, the agreement itself called for these costs to be reimbursed only if "the auditors discover an underpayment of more than five percent (5%) of the Royalties paid for the period audited." Murphy's argument makes no claim this provision was triggered. Finally, the trial court explained that by electing to notice a breach based on the audit, Murphy had elected its remedy with respect to any fees charged to conduct the allegedly failed audit. Murphy makes no argument contesting this explanation.

Regardless, Murphy's argument on appeal fails for a more fundamental reason: An error in the calculation of damages would not be reversible. The trial court specifically found both that Murphy had failed to prove damages and that an audit had

34.

been successfully completed.  In its recitation of relevant facts, the court determined Murphy "reviewed all 'royalty statements' provided by Fineline and determined that Fineline had breached the license agreement because Fineline did not pay all royalty payments due in a timely and correct manner, among other things."  Later, the trial court explained:  "[T]he evidence admitted at trial indicates that Fineline attempted to make arrangements for the audit and [Murphy] failed to communicate its intentions to seek any particular records.  Further, there *was* an 'audit' allowed, even if [Murphy] didn't believe it was sufficient under the terms of the licensing agreement."  Murphy makes no attempt to challenge the court's finding of no breach and thus cannot demonstrate reversible error in its damages argument.  (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237 ["When a trial court states multiple grounds for its ruling and appellant addresses only some of them, we need not address appellant's arguments because 'one good reason is sufficient to sustain the order from which the appeal was taken.' "].)

## DISPOSITION

The judgment is reversed with respect to the calculation of prejudgment interest, and the matter remanded for the trial court to recalculate this figure.  In all other respects, the judgment is affirmed.

Costs are awarded to Fineline.


HILL, P. J.

WE CONCUR:


LEVY, J.


PEÑA, J.

35.